## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| Lisa Jean Isham, | **Civil No. 13-2377 (JRT/SER)** |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Carolyn W. Colvin,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

Lionel H. Peabody, Esq., PO Box 10, Duluth, Minnesota 55801, for Plaintiff.

Pamela Marentette, Esq., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

STEVEN E. RAU, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Lisa Jean Isham ("Isham") seeks review of the Acting Commissioner of Social Security's ("Commissioner") denial of her application for Supplemental Security Income ("SSI"). *See* (Compl.) [Doc. No. 1]. The parties filed cross-motions for summary judgment [Doc. Nos. 20, 28] that have been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Isham's Motion for Summary Judgment be granted in part and the Commissioner's Motion for Summary Judgment be denied.

# I.     BACKGROUND

## A.     Procedural History

Isham filed her application for SSI on April 28, 2011. (Admin. R.) [Doc. No. 18 at 195].[1] Isham listed an alleged onset date ("AOD") of December 31, 2009, and claimed disability due to depression, anxiety, post-traumatic stress disorder ("PTSD"), dyslexia/illiteracy, attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, foot and ankle pain, asthma, migraines, and deafness in the left ear. (*Id*. at 88, 195). Isham's claims were denied initially on July 1, 2011, and again upon reconsideration on October 6, 2011. (*Id*. at 111–13, 118–19). Administrative Law Judge Paul Gaughen (the "ALJ") heard the matter on January 11, 2013, and May 1, 2013. (*Id*. at 31, 54). The ALJ issued an unfavorable decision on May 17, 2013, and determined Isham was not disabled. (*Id*. at 10–23). The Appeals Council denied Isham's request for review on July 9, 2013, rendering the ALJ's decision final. (*Id*. at 1–3); *see* 20 C.F.R. § 416.1481.

## B.     Isham's Background and Testimony

At the AOD, Isham was 47, making her a younger person. (Admin. R. at 88); 20 C.F.R. § 416.963(c). Her highest grade of school completed is 11th grade, and she previously worked as a cleaner and floor installer. (Admin. R. at 61–63, 69, 240, 251).

### 1.     January 11, 2013 Hearing

Isham believed she was incapable of performing any of her previous jobs. (*Id*. at 73). Isham testified she could not concentrate and pay attention to things. (*Id*. at 68). She cannot read very well or follow written instructions at a job, and she cannot start something, stay on task, and get it done. (*Id*. at 69–70). Isham reported that if she is under pressure or stress, she screams and is mean to herself, which happens almost every day. (*Id.* at 71). Usually, she has someone else

---

[1]     Isham also filed for disability insurance benefits, but does not challenge that decision here. *See* (Admin. R. at 204); (Compl.).

cook her breakfast, and she does not shower every day. (*Id*. at 72). Isham can do housework, laundry, take care of herself, and keep herself clean if she needs to. (*Id*. at 73). She testified that she cannot deal with things like the mail and bills. (*Id*. at 73).

Isham experiences pain in her ankles, but braces help. (*Id*. at 74). She can stand for five to ten minutes at a time. (*Id*. at 74–75).

Isham testified she did poorly in school. (*Id.* at 76). She went to a special school where she worked at her own pace, and was in special education. (*Id.* at 77). Her therapist or case worker helped her fill out the forms required for her Social Security filing. (*Id.* at 78).

### 2. May 1, 2013 Hearing

At the second hearing, Isham testified that her floor layer job required her to run liquid flooring back and forth. (*Id.* at 36). She did not receive any vocational or job rehabilitation assistance to do this job. (*Id.* at 38). She worked with at least ten other workers, and there was a supervisor for all employees on the shift, plus an additional supervisor just for her, who was also her boyfriend. (*Id.* at 38–39).

### C. Relevant Medical Record Evidence

Certain records in the Administrative Record concern impairments and illnesses that neither of the parties nor the ALJ base their analysis on, and that the Court does not find relevant—such medical records will not be summarized.

### 1. Before December 31, 2009

On December 25, 2003, William K. Gitar, MD ("Dr. Gitar"), evaluated Isham at the Essentia Health emergency room for left ankle pain. (*Id.* at 517). Isham stated that she fell out of the upstairs window of her residence and admitted to drinking at the time of the incident. (*Id.*). Upon reviewing the x-rays, Dr. Gitar diagnosed Isham with a left ankle sprain and gave her an

Ace wrap and crutches to use on an as-needed basis. (*Id.* at 518).

Leslie Gibbs, MSEd ("Gibbs"), saw Isham on August 4, 2005, for a Mental Health Diagnostic Assessment. (*Id.* at 489). Isham reported feeling depressed and continuing to grieve the loss of her son approximately three years before. (*Id.*). She also reported appetite disturbance, sleeping problems, short-term memory difficulties, crying for no reason, severe mood swings, loss of enjoyment in activities, nightmares, panic attacks, and auditory and visual hallucinations. (*Id.*). Gibbs noted that Isham was "weepy in assessment" and that her "[t]hought process seemed fragmented." (*Id.* at 490). Gibbs diagnosed Isham with recurrent and severe major depressive disorder with psychotic features, bereavement, and polysubstance dependence, and assigned a GAF score of 50.[2] (*Id.* at 491).

On August 22, 2005, Laura Stresow, RN, CNP ("Stresow"), evaluated Isham for a physical. (*Id.* at 463). Isham told Stresow she was anxious, depressed, fearful, and irritable. (*Id.* at 464). She also said she attempted suicide twice after the death of her son. (*Id.*). Upon physical examination, Stresow noted bursitis on the anterior surface of Isham's right ankle that was neither hot, red, nor tender.[3] (*Id.*). Stresow recommended Isham follow up with another office visit in one month, continue counseling, and recommended an orthopedic evaluation of the bursa.

---

[2]     Clinicians use the Global Assessment of Functioning Scale ("GAF"), a scale of zero to 100, to subjectively rate an adult client's psychological, social, and occupational or school functioning based on mental illness. *Diagnostic and Statistical Manual of Mental Disorders* 32 (American Psychiatric Assoc. 4th ed. 1994) ("DSM-IV"). Scores from 31 to 40 indicate some impairment in reality testing or communication or "major impairment in several areas such as work or school, family relations, judgment, thinking, or mood." *Id.* Scores from 41 to 50 indicate serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* Scores from 51 to 60 indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* Scores from 61 to 70 indicate some mild symptoms or some difficulty in social, occupational, or school functioning. A person with a GAF score between 61 and 70 is "generally functioning pretty well[ and] has some meaningful interpersonal relationships." *Id.*

[3]     Bursitis is the inflammation of a bursa, a sac containing fluid found in parts of the body where a tendon passes over a bone, such as the hip or elbow. *Stedman's Medical Dictionary*, Bursa, Bursitis (27th ed. 2000).

(*Id.* at 465).

Greg Goodrich, LPC, NCC ("Goodrich"), provided therapy to Isham on January 6, 2006. (*Id.* at 493). Goodrich diagnosed Isham with recurrent severe major depressive disorder, with bereavement and polysubstance abuse, and assigned a GAF score of 50. (*Id.*). Goodrich recommended Isham see her medical personnel for evaluation for antidepressants. (*Id.*). In his May 26, 2006 termination summary, Goodrich noted that Isham's final diagnosis was depression and alcohol dependence, and her GAF score was 50. (*Id.* at 497). He noted that Isham did not follow through with the following: attendance at grief groups, psychotropic medication referral, Alcoholics Anonymous ("AA") meetings, Rule 25 Assessment, or the recommendation that she meet with a native spiritual person.[4] (*Id.*). He noted she was seen by himself and Sue Hall, MSEd, LP ("Hall"), and did not attend further appointments. (*Id.*).

On August 18, 2006, Isham saw David O. Jorde, MD ("Dr. Jorde"), for acute emotional distress. (*Id.* at 468). Isham reported she had been crying frequently, had poor concentration, was eating little, getting poor sleep, and had multiple crying spells per day. (*Id.*). Dr. Jorde diagnosed Isham with depression and prescribed Zoloft.[5] (*Id.* at 469).

Hall saw Isham on August 18, 2006, for an individual therapy appointment. (*Id.* at 494). Hall diagnosed Isham with acute stress disorder, PTSD, history of recurrent and severe major depressive disorder, polysubstance dependence, and personality disorder, and assigned Isham a GAF score of 40. (*Id.*). Isham reported she was continuing to drink alcohol to the point of

---

[4]     A Rule 25 Assessment is a chemical use assessment for people seeking treatment or for people for whom treatment is sought for a substance abuse disorder before being placed in a treatment program. Minn. R. 9530.6615, Subpt. 1.

[5]     Zoloft is the brand name for sertraline, which is "used to treat depression, obsessive-compulsive disorder . . . , panic disorder, premenstrual dysphoric disorder . . . , . . . []PTSD[], and social anxiety disorder . . . ." Sertraline (Oral Route), Mayo Clinic (Dec. 1, 2014), http://www. mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940.

intoxication and sometimes had blackouts. (*Id.*). She also reported having thoughts such as "I deserve to die," difficulty concentrating, and difficulty sleeping. (*Id.*). Hall recommended a Rule 25 Assessment, supportive psychotherapy, eye movement desensitization and reprocessing ("EMDR") trauma work, and possibly obtaining an advocate.[6] (*Id.* at 495). Hall was scheduled to see Isham on August 31, 2006, however, Isham arrived at the appointment after drinking, and the appointment was rescheduled. (*Id.* at 496).

Lorraine L. T. Turner, MD ("Dr. Turner"), treated Isham on January 27, 2007. (*Id.* at 470). Dr. Turner noted that Isham had a history of hearing loss in her left ear, depression, alcohol abuse, and migraines. (*Id.*). Isham reported drinking six to twelve beers daily and marijuana use. (*Id.*). Isham also reported chronic daily headaches and vague pain with the popping of her knee and ankle joints when walking or doing other activities. (*Id.* at 471). Dr. Turner's physical examination of Isham was normal overall. *See* (*id.* at 472–73). Dr. Turner recommended Isham continue with therapy and follow up in one month. (*Id.* at 473).

Isham was seen by Robert W. Stubenvall, MD ("Dr. Stubenvall"), on May 30, 2007, for history of hearing loss. (*Id.* at 507). The audiogram showed "mild high frequency neurosensory hearing loss in the right ear with profound left neurosensory hearing loss."[7] (*Id.*).

When Hall left her position, she completed a termination summary. (*Id.* at 498). Her final diagnosis of Isham was bereavement; history of mild, recurrent major depressive disorder; polysubstance dependence; and personality disorder. (*Id.*). Hall opined Isham had made progress

---

[6]     "EMDR combines exposure therapy with a series of guided eye movements that help [a person] process traumatic memories and change how [a person] react[s] to traumatic memories." Post-traumatic stress disorder (PTSD), Mayo Clinic (April 15, 2014), http://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/basics/treatment/con-20022540.

[7]     An audiogram is "[t]he graphic record drawn from the results of hearing tests with an audiometer, which charts the threshold of hearing at various frequencies against sound intensity in decibels." *Stedman's Medical Dictionary*, Audiogram (27th ed. 2000).

in therapy and recommended Isham attend her scheduled medical appointments, consider a Rule 25 Assessment and follow those recommendations made based on the assessment. (*Id.*).

On July 2, 2007, Isham was again seen by Stresow. (*Id.* at 476). Isham complained of anxiety and difficulty concentrating, headaches, dyspnea, and bilateral ankle pain that had worsened over the last year.[8] (*Id.*). Upon examination, Stresow noted slightly reduced range of motion in the right foot and swelling with moderately reduced range of motion in the left foot. (*Id.* at 477). Stresow noted that the area of swelling on the left foot was greater than two inches long and one inch wide with a fluid-filled sac on the anterior portion of the left medial ankle. (*Id.* at 478). No erythema was noted.[9] (*Id.*). Stresow prescribed Buspar for anxiety and encouraged Isham to establish medical treatment with a primary doctor.[10] (*Id.*). She also recommended aspiration of the bursa on Isham's left ankle. (*Id.*). Dr. Turner consulted with Dr. Zamzow on August 15, 2007, regarding the bursa. (*Id.* at 479). It was recommended the bursa be excised under general anesthesia. (*Id.*).

On December 31, 2007, Isham was seen by Ellie Schoenfeld, MSW, LICSW ("Schoenfeld"), for therapy. (*Id.* at 499). Isham continued to be diagnosed with bereavement, polysubstance dependence, recurrent and chronic major depressive disorder, anxiety disorder, physical abuse, and history of personality disorder. (*Id.*). At the time of this appointment Isham's GAF score was 30, with the highest GAF score in the past year being 63. (*Id.*). Isham reported daily and frequent crying, depressed mood, inability to think, recurrent thoughts of death and

---

[8]     Dyspnea is "[s]hortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude." *Stedman's Medical Dictionary*, Dyspnea (27th ed. 2000).

[9]     Erythema is "[r]edness due to capillary dilation, usually signaling a pathologic condition . . . ." *Stedman's Medical Dictionary*, Erythema (27th ed. 2000).

[10]     Buspar is the brand name for buspirone, which is "used to treat certain anxiety disorders or to relieve the symptoms of anxiety." Buspirone (Oral Route), Mayo Clinic (Dec. 1, 2014), http://www.mayoclinic.org/drugs-supplements/buspirone-oral-route/description/drg-20062457.

suicidal ideation without a specific plan, and anxiety attacks. (*Id.*). Further, Isham reported drinking every day, smoking a lot of marijuana, and periodically using other drugs. (*Id.*). Schoenfeld recommended a Rule 25 Assessment and follow through with any recommendations. (*Id.* at 500). Schoenfeld further encouraged Isham to leave her abusive relationship and call a crisis line and/or go to the hospital if she was feeling suicidal, and to keep medical appointments. (*Id.*).

On January 11, 2008, Patrick Boyle, CNP ("Boyle"), saw Isham for a medication check. (*Id*. at 480). Isham reported it was very difficult for her to meet home, work, and social obligations. (*Id.*). She reported feeling anxious, experiencing fearful and compulsive thoughts and behavior, irritable moods, feelings of guilt or worthlessness, sleep disturbances, fatigue and loss of energy, poor concentration, and indecisiveness. (*Id.*). Isham also reported that she drank twelve to eighteen beers daily and smoked marijuana occasionally. (*Id.*). Boyle talked at length with Isham about alcohol abuse and its depressant effects. (*Id.*).

Mollie A. Stapleton, MD ("Dr. Stapleton"), saw Isham on February 22, 2008, for depression. (*Id.* at 482). Isham reported she had been off her medications since July and had been hearing voices. (*Id.*). Additionally, Isham stated she was drinking daily and had memory and attention problems. (*Id.*). Upon examination, Dr. Stapleton noted Isham was agitated, positive for anhedonia, anxious, exhibited compulsive behaviors, had deficient fund of knowledge and language, was fearful, had flight of ideas, was forgetful, had for auditory hallucinations, and had a poor attention span and concentration.[11] (*Id.*). Dr. Stapleton opined that Isham had abnormal

---

[11]     Anhedonia is the "[a]besence of pleasure from the performance of acts that would ordinarily be pleasurable." *Stedman's Medical Dictionary*, Anhedonia (27th ed. 2000).

comprehension. (*Id.*). Isham was prescribed Effexor and Buspar.[12] (*Id.* at 483).

On March 7, 2008, Dr. Stapleton saw Isham for follow-up and a medication check. (*Id.* at 484). Isham reported she started taking Effexor and Buspar, but stopped quickly because they made her feel more depressed and "sick." (*Id.*). Isham also reported continued drinking and hearing voices. (*Id.*). Dr. Stapleton asked Isham to return for a follow-up visit in two weeks and encouraged her to make a therapy appointment. (*Id.* at 485).

On September 25, 2008, Isham was seen in the emergency room of St. Mary's Medical Center with a cut to her left forearm. (*Id.* at 528). She reported cutting herself three days before because she was depressed and frustrated. (*Id.*). John E. Slettedahl, RN, CNP, gave her Cephalexin to help the infection and referred her to a social worker for her depression issues and self-injurious behavior.[13] (*Id.* at 528–29).

Dr. Stapleton saw Isham on April 27, 2009, for a rash and cough. (*Id.* at 366). Isham reported being assaulted two weeks earlier and was still having headaches. (*Id.*). She stopped taking her medications again because they made her hallucinations worse. (*Id.*). Dr. Stapleton noted that Isham smelled of alcohol and Isham reported drinking to manage her pain. (*Id.*). Upon examination, Dr. Stapleton found Isham to have a depressed affect. (*Id.* at 367). Isham appeared to be agitated, was had anhedonia, was anxious, and exhibited compulsive behavior and poor

---

[12]     Effexor is the brand name for venlafaxine, which is "used to treat depression. It is also used to treat general anxiety disorder, social anxiety disorder, and panic disorder." Venlafaxine (Oral Route), Mayo Clinic (Dec. 1, 2014), http://www.mayoclinic.org/drugs-supplements/venlafaxine-oral-route/description/drg-20067379.

[13]     Cephalexin is "used to treat bacterial infections in many different parts of the body." Cephalexin (Oral Route), Mayo Clinic (Aug. 1, 2014), http://www.mayoclinic.org/drugs-supplements/cephalexin-oral-route/description/drg-20073325.

judgment. (*Id.*). Her auditory hallucinations continued. (*Id.*). Dr. Stapleton prescribed Seroquel.[14] (*Id.*).

Dr. Stapleton saw Isham on May 11, 2009, for a follow-up to headaches that arose after the assault, and to treat Isham's depression. (*Id.* at 369). Isham reported that Seroquel was helping her sleep, but that she felt groggy in the morning; she was advised to cut the dosage in half. (*Id.*). Upon examination, Isham was not agitated, but was anxious and said she was feeling disconnected from reality. (*Id.* at 368).

On May 19, 2009, Dr. Kimberly Schmidt ("Dr. Schmidt") called Dr. Stapleton to inform her Isham was currently in Dr. Schmidt's office and was talking about taking Seroquel to commit suicide. (*Id.* at 487). Dr. Schmidt further reported that Isham admitted to drinking three beers and a shot of hard liquor before seeing Dr. Schmidt. (*Id.*). Dr. Stapleton spoke to Isham on speaker phone and Isham agreed to bring her medications into the clinic for disposal. (*Id.*).

On June 19, 2009, Isham was seen by Dr. Turner at St. Mary's Medical Center's intensive care unit ("ICU"). (*Id.* at 335). Isham was brought to the emergency room by her partner because he thought her behavior was "funny" and thought her mental status was abnormal. (*Id.*). Isham was transferred to the ICU. (*Id.*). The partner reported that he and Isham had an argument earlier in the day and she left. (*Id.*). When she returned, her partner noted that she was behaving "funny" and her speech was slurred. (*Id.*). Dr. Turner noted Isham was difficult to arouse in the emergency room and had a seizure on the floor in the ICU. (*Id.* at 335–36). Upon examination, Dr. Turner noted it was difficult to get any reliable history from Isham as she was intermittently dozing with slurred speech. (*Id.*). Isham admitted to taking some of her

---

[14]     Seroquel is the brand name for quetiapine, which is "used to treat nervous, emotional, and mental conditions . . . ." Quetiapine (Oral Route), Mayo Clinic (Dec. 1, 2014), http://www. mayoclinic.org/drugs-supplements/quetiapine-oral-route/description/drg-20066912.

father's sleeping pills and drinking some alcohol, but denied taking other drugs. (*Id.* at 336).

Isham's urine toxicology screen was positive for amphetamines, tricyclics, and THC.[15] (*Id.*).

Because Isham refused voluntary hospitalization, Jayme A. Bork, DO ("Dr. Bork"), hospitalized

Isham on a seventy-two-hour hold. (*Id.* at 334). Dr. Bork discharged Isham on June 23, 2009.

(*Id.* at 332). Isham's GAF score was 40 on June 21, and 55 on June 23, 2009. (*Id.* at 332, 335).

On December 26, 2009, Francis W. Nelson, MD ("Dr. Nelson"), saw Isham at St. Mary's

Medical Center's emergency room, when she presented with nausea, vomiting, and abdominal

pain. (*Id.* at 535). Lab tests revealed alcoholic gastritis.[16] (*Id.* at 536). Dr. Nelson recommended

no alcohol, no ibuprofen, and no spicy foods, and prescribed Prilosec, Maalox, Zofran, and

Phenergan.[17] (*Id.*).

---

[15]    Amphetamine is "[a] chemical compound that is structurally a sympathomimetic amine, considered a psychostimulant, and approved by the FDA to treat narcolepsy and ADHD; [it] acts primarily by triggering release of norepinephrine, dopamine, and serotonin from presynaptic neurons. Because of its potential for abuse, it is scheduled by the FDA in the most restrictive classification for a drug with medical usefulness." *Stedman's Medical Dictionary*, Amphetamine (27th ed. 2000).
         Tricyclic antidepressant is "a chemical group of antidepressant drugs that share a three-ringed nucleus." *Stedman's Medical Dictionary*, Tricyclic antidepressant (27th ed. 2000).
         THC is the abbreviation for tetrahydrocannabinols, which are "the psychoactive isomers present in Cannabis, isolated from marijuana." *Stedman's Medical Dictionary*, Tetrahydrocannabinols (27th ed. 2000).
[16]    Gastritis is an "inflammation, especially mucosal, of the stomach." *Stedman's Medical Dictionary*, Gastritis (27th ed. 2000).
[17]    Prilosec is the brand name for omeprazole, which is "used to treat certain conditions where there is too much acid in the stomach." Omeprazole (Oral Route), Mayo Clinic (Dec. 1, 2014), http://www.mayoclinic.org/drugs-supplements/omeprazole-oral-route/description/drg-20066836.
         Maalox is the brand name for simethicone, which is "used to relieve the painful symptoms of too much gas in the stomach and intestines." Simethicone (Oral Route), Mayo Clinic (Sep. 1, 2014), http://www.mayoclinic.org/drugs-supplements/simethicone-oral-route/description/drg-20068838.
         Zofran is the brand name for ondansetron, which is "used to prevent nausea and vomiting that is caused by cancer medicines (chemotherapy) or radiation therapy. It is also used to prevent nausea and vomiting that may occur after surgery." Ondansetron (Oral Route), Mayo Clinic

### 2. After December 31, 2009

On February 1, 2010, Dr. Schmidt saw Isham for intake at Arrowhead Psychological Clinic. (*Id.* at 343, 349). Dr. Schmidt's initial diagnosis was bipolar type of schizoaffective disorder, PTSD, alcohol dependence, dependent personality features, and ankle, knee, and hip problems, and Isham's GAF score was 38. (*Id.*). Isham reported she was "super suicidal" and that she had tried to kill herself three times. (*Id.*). She further reported that she was no longer taking any of her medications because they made her "feel stupid." (*Id.* at 334). Dr. Schmidt noted that during the intake, Isham acted like a young child, was hard to keep on track, and had difficulty with boundaries and a tendency to be impulsive. (*Id.*). Dr. Schmidt opined that Isham's IQ was likely low. (*Id.*). Isham reported that she had been drinking more frequently and that she wanted to be dead to be with her son Eric, who passed away several years ago. (*Id.* at 345). Isham reported that she did not believe she could work, saying "I would probably sit down and cry." (*Id.* at 345).

Dr. Schmidt opined that Isham's symptomatology included: angry outbursts; anxiety upon exposure to stimuli symbolizing trauma; auditory hallucinations; avoidance of situations that elicit memories of trauma; depressed mood; difficulty falling asleep; difficulty reading and writing; diminished ability to feel pleasure; distressing and intrusive memories of trauma; feelings of detachment from others; feelings of hopelessness; impaired concentration; low self-esteem; poor comprehension; poor concentration; poor judgment; racing thoughts; difficulty being alone and functioning independently; recurrent dreams of trauma; suicidal ideation without

---

(Dec. 1, 2014), http://www.mayoclinic.org/drugs-supplements/ondansetron-oral-route-oromucosal-route/description/drg-20074421.

Phenergan is the generic name for promethazine, which "is used to relieve or prevent the symptoms of hay fever, [eye inflammation], and other types of allergy or allergic reactions. Promethazine (Rectal Route), Mayo Clinic (Dec. 1, 2014), http://www.mayoclinic.org/drugs-supplements/promethazine-rectal-route/description/drg-20070623.

intent to act; and visual hallucinations. (*Id.* at 346). Dr. Schmidt further opined a "learning disability is evident." (*Id.*). Dr. Schmidt reported Isham's thought content was characterized by preoccupation with external stressors and her son's death. (*Id.* at 347). Further, Dr. Schmidt found Isham's attention and concentration to be characterized by a below-average ability to attend and maintain focus. (*Id.*). Dr. Schmidt recommended Isham attend individual therapy and chemical dependency treatment. (*Id.*).

Between April 21, 2010, and September 12, 2011, Isham saw Schoenfeld for twenty-two individual therapy appointments at Fond du Lac Human Services.[18] (*Id.* at 418–43). On October 27, 2010, Isham was admitted to the Center for Alcohol & Drug Treatment for outpatient treatment for alcohol dependence. (*Id.* at 390–92). At that time, her GAF score was 45. (*Id.* at 392).

On December 6, 2010, Schoenfeld completed a treatment update regarding Isham. (*Id.* at 501). Schoenfeld noted that Isham's diagnoses were alcohol dependency, cannabis dependency, recurrent major depressive disorder, anxiety disorder, and victim of physical abuse, and assigned Isham a GAF score of 50. (*Id.*). Isham continued to describe ongoing issues of low mood, feelings of worthlessness, recurrent thoughts of suicide, diminished ability to concentrate, and fatigue. (*Id.*). Additionally, Isham reported she continued to drink alcohol and smoke marijuana, even though she was participating in outpatient treatment. (*Id.*). Schoenfeld recommended Isham continue with individual therapy, continue with sobriety and treatment, utilize community supports such as mental health case management and other stabilization programs, and increase her sober support system. (*Id.* at 502).

---

[18]    Schoenfeld's notes describe Isham's mood and circumstances at each appointment. *See* (Admin. R. at 418–43). Because these notes are not relevant to the ALJ's decision or the Court's analysis, the Court does not summarize them here.

Dr. Turner saw Isham on December 21, 2010, regarding the hearing loss in Isham's left ear, lower abdominal pain, and headaches. (*Id.* at 374). Isham reported she had been sober for two months and was attending outpatient treatment. (*Id.*). Isham was referred to audiology for her hearing loss. (*Id.* at 377).

On January 19, 2011, Schoenfeld completed a Social Security Medical Opinion form. (*Id.* at 513). In the report, Schoenfeld indicated Isham was diagnosed with major depressive disorder, substance dependency, and anxiety. (*Id.*). She indicated that Isham had mental illness, learning disability, and chemical dependency. (*Id.*). She opined that Isham would not be able to perform any employment in the foreseeable future and that it was unknown if Isham would still have a disabling condition if she stopped her addictive behavior. (*Id.*). Schoenfeld completed a second Social Security Medical Opinion form on April 15, 2011. (*Id.* at 514). Schoenfeld's opinion was the same, except that she opined that if Isham stopped her addictive behaviors, there would still be a disabling condition. (*Id.*). Schoenfeld completed a third Social Security Medical Opinion form on December 3, 2011. (*Id.* at 515). Her findings were the same as her April 15, 2011 opinion. (*Id.*); *see also* (*id.* at 514).

On March 9, 2011, Isham was seen by George L. Horvat, PhD, LP ("Dr. Horvat"), for a mental health status evaluation and testing. (*Id.* at 380). Dr. Horvat observed that Isham was restless, depressed, and tearful at times and displayed difficulty finding the words she wanted to use. (*Id.* at 381). Isham stated she was suicidal and had "extreme depression." (*Id.*). She also said her head and ankles were painful, rating the pain as a six. (*Id.*). Isham reported anxiety attacks and said she has to work hard not to hyperventilate. (*Id.*). She further explained she had heard voices since grade school that tell her not to do different things and that she sees vague faces. (*Id.*). Isham told Dr. Horvat she could not follow written instructions because she did not read,

14

but if the instructions were given verbally in basic language, she is able to follow them. (*Id.* at 382). Upon examination, Dr. Horvat noted that Isham was distracted and her concentration was scattered. (*Id.*). Dr. Horvat opined that Isham's mood and affect were depressed and that she was preoccupied with thoughts of suicide. (*Id.* at 383). When Dr. Horvat asked Isham if she thought she was impaired, she replied, "Yes, my feet. I can't stand on them for long and I can't walk very far. I can't focus. I'm easily bored." (*Id.* at 384). Dr. Horvat diagnosed Isham with alcohol dependence, bereavement, PTSD, ADHD, bipolar II, and delusional disorder.[19] (*Id.* at 385). Dr. Horvat opined that Isham was not capable of handling her own finances and did not have the mental capacity to understand, remember, and follow directions. (*Id.* at 386). Dr. Horvat did think, however, that Isham had the mental capacity to carry out work-like tasks if they were routine, repetitive, and labor intensive, and had the mental capacity to respond appropriately to co-workers and supervisors. (*Id.*). Dr. Horvat further opined that Isham had the mental capacity to tolerate the stress and pressure found in an entry-level, routine, repetitive, labor intensive type of workplace. (*Id.*). Dr. Horvat recommended Isham do the following: go to treatment and attend AA meetings for her alcohol dependence, go to treatment for her grief, and continue to participate in psychiatric treatment. (*Id.*). He also recommended Isham be referred to vocational rehabilitation. (*Id.*).

On June 30, 2011, Sue Solomon, LSW, LADC ("Solomon"), completed a Discharge Narrative for Isham. (*Id.* at 393). Isham was being discharged from outpatient treatment as she had been referred to residential treatment to help stabilize her potential use of alcohol and drugs and gain sobriety. (*Id.*).

---

[19]    Bipolar II disorder is "an affective disorder characterized by the occurrence of alternating hypomanic and major depressive episodes[ and] a DSM diagnosis that is established when the specified criteria are met." *Stedman's Medical Dictionary*, Bipolar II disorder (27th ed. 2000).

Isham presented to Kirsten Kortesma, CNP ("Kortesma"), on August 1, 2011, for a physical. (*Id.* at 361). Isham told Kortesma she was in alcohol treatment and that it was going well. (*Id.*). Isham stated she had previously taken Effexor and Buspar for depression and anxiety, but that she had not taken any medications since 2009 and asked that she be put on an alternative medication. (*Id.*). Isham complained of ankle pain from falling out of a window ten years earlier. (*Id.*). She said the pain was getting worse, especially when she stood in one spot for too long. (*Id.*). She was prescribed Celexa.[20] (*Id.* at 364).

On August 8, 2011, Isham was discharged from the Center for Alcohol & Drug Treatment after successfully completing the program. (*Id.* at 412).

Tina M. Posch, MA ("Posch"), saw Isham on September 14, 2011, for a hearing evaluation. (*Id.* at 450). The evaluation revealed no usable hearing in the left ear with very poor word recognition. (*Id.*). Posch opined that Isham would benefit from some type of amplification. (*Id.*).

On January 23, 2012, Isham presented to St. Mary's Medical Center's emergency room complaining of lumbar back and coccyx pain after slipping and falling on ice.[21] (*Id.* at 547). Isham's x-rays were normal. (*Id.*).

On March 14, 2012, Schoenfeld completed a Mental Functional Limitations form. (*Id.* at 552). She opined that Isham had little or no difficulty remembering locations and work-like procedures, but was frequently unable to understand and remember detailed instructions. (*Id.*).

---

[20]  Celexa is the brand name for citalopram, which is "used to treat depression." <u>Citalopram (Oral Route)</u>, Mayo Clinic (Dec. 1, 2014), http://www.mayoclinic.org/drugs-supplements/citalopram-oral-route/description/drg-20062980.

[21]  The coccyx is "the small bone at the end of the vertebral column in humans, formed by the fusion of four rudimentary vertebrae[.]" *Stedman's Medical Dictionary*, Coccyx (27th ed. 2000).

Additionally, Schoenfeld found Isham had occasional difficulty carrying out short and simple instructions; was frequently unable to carry out detailed instructions; was frequently unable to maintain attention and concentration for extended periods of time; was occasionally unable to perform activities within a schedule; was frequently unable to maintain regular attendance; was occasionally unable to sustain an ordinary routine without special supervision; was frequently unable to work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 552–53). Schoenfeld noted that Isham had a difficult time with concentration and with "frustrations tolerance." (*Id.* at 553).

Regarding social interaction and adaption, Schoenfeld found Isham was occasionally unable to interact appropriately with the general public and to ask simple questions or request assistance; had occasional difficulty accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; was occasionally unable to respond appropriately to changes in the work setting; had occasional difficulty being aware of normal hazards and precautions, and traveling in unfamiliar places or using public transportation; and was occasionally or frequently unable to set realistic goals or make plans independently. (*Id.* at 554). Schoenfeld noted Isham "would likely have a difficult time with change and would have a very difficult time working with people who are difficult for her to be around." (*Id.*).

On March 27, 2012, Jeanne Nelson, MSW ("Ms. Nelson") completed a Mental

Functional Limitations form.[22] (*Id.* at 558). Ms. Nelson found Isham had little or no difficulty remembering locations and work-like procedures and was frequently unable to understand and remember detailed instructions. (*Id.*). Ms. Nelson noted Isham was capable of following detailed/structured work-like procedures with expectations that are clearly defined on a regular routine basis but has difficulty understanding short, simple instructions. (*Id.*). Ms. Nelson further opined that Isham had difficultly remembering detailed instructions, "[h]owever[,] given reasonable support from professional services on a continuous basis she demonstrate[d] an improvement within recall." (*Id.*).

Regarding sustained concentration and persistence, Ms. Nelson found Isham had occasional difficulty carrying out short and simple instructions; was frequently unable to carry out detailed instructions; was frequently unable to maintain attention and concentration for extended periods of time; was occasionally unable to perform activities within a schedule; was frequently unable to maintain regular attendance; was occasionally unable to be punctual within customary tolerance; was occasionally unable to sustain an ordinary routine without special supervision; was frequently unable to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 559). Ms. Nelson noted that Isham often demonstrated difficulty in maintaining concentration and focusing within longer periods of time, and occasionally demonstrated difficulty performing activities within a schedule. (*Id.*). She displayed frustration and was closed off from performing routine tasks and would have difficulty making work-related decisions because she is easily distracted

---

[22]    The Court uses "Ms. Nelson" to differentiate this provider from Dr. Nelson, who treated Isham on December 26, 2009. *See* (Admin. R. at 535).

by others and her psychologically based symptoms. (*Id.*).

Regarding social interaction and adaption, Ms. Nelson found that Isham was occasionally unable to interact appropriately with the general public; was frequently unable to ask simple questions or request assistance; had occasional difficulty accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintaining socially appropriate behavior, and adhering to basic standards of neatness and cleanliness; was occasionally unable to respond appropriately to changes in the work setting and to be aware of normal hazards and precautions; had occasional difficulty traveling in unfamiliar places or using public transportation; and was frequently unable to set realistic goals or make plans independently of others. (*Id.* at 560). Ms. Nelson noted Isham would have difficulty setting realistic goals and making plans independently of others. (*Id.*).

On July 15, 2012, Isham arrived at St. Mary's Medical Center's emergency room via ambulance. (*Id.* at 566). Karen A. Lushine, MD ("Dr. Lushine"), reported Isham was found passed out on a sidewalk by a passerby who started CPR.[23] (*Id.*). When paramedics arrived, she was breathing and had a slow pulse, so she was given Narcan, which helped wake her.[24] (*Id.*). Dr. Lushine reported that Isham's urine toxicology was positive for opiates, THC, and

---

[23]     CPR, the abbreviation for cardiopulmonary resuscitation, is the "restoration of cardiac output and pulmonary ventilation following cardiac arrest and apnea, using artificial respiration and manual closed-chest compression or open-chest cardiac massage." *Stedman's Medical Dictionary*, Cardiopulmonary resuscitation (27th ed. 2000).

[24]     Narcan is the brand name for naloxone, which is an injection "used to treat an opioid emergency such as an overdose or a possible overdose of a narcotic medicine." Naloxone (Injection Route), Mayo Clinic (Sept. 1, 2014), http://www.mayoclinic.org/drugs-supplements/naloxone-injection-route/description/drg-20095285.

amphetamines.[25] (*Id.* at 567). She was admitted to the ICU for a multi-drug overdose and discharged from the hospital on July 18, 2012. (*Id.* at 562, 566).

Dr. Stapleton saw Isham on December 19, 2012, for a physical. (*Id.* at 580). Isham complained of chronic pain in both ankles. (*Id.*). Upon examination, Isham's affect was normal, she was not agitated, and she did not have anhedonia or suicidal ideation. (*Id.* at 582). Dr. Stapleton recommended physical therapy for her ankle pain. (*Id.*).

On January 25, 2013, Dean C. Anderson, PT ("Anderson"), saw Isham for a rehabilitation evaluation. (*Id.* at 602). Isham presented with left shoulder and bilateral ankle pain. (*Id.*). Isham reported the ankle pain began ten years earlier after she fell from a window and had been worsening. (*Id.*). She said she felt limited in what she was able to do and rated the pain a seven out of ten. (*Id.*). Isham had difficulty putting weight on her feet and ankles in the morning and after being off her feet for a period of time. (*Id.*). She reported that the shoulder pain limited her ability to lift, reach overhead, and to sleep comfortably on her side. (*Id.*). Upon examination, Anderson found Isham had difficulty transferring from a sitting position to standing, but the transition was otherwise normal. (*Id.* at 603). Her gait activity was normal after some pain-reducing steps initially, and there was no noticeable swelling or tissue inflammation noted in her left shoulder or ankles. (*Id.*). Impingement testing and a supraspinatus test was positive and the isometric strength of Isham's ankles were 4+/5 and her left shoulder was 4-/5.[26] (*Id.*). Anderson

---

[25]   Opiate is "any preparation or derivative of opium." *Stedman's Medical Dictionary*, Opiate (27th ed. 2000). Opium is "the air-dried milky exudation obtained by incising the unripe capsules of *Papaver somniferum* . . . . It is [u]sed as an analgesic, hypnotic, and diaphoretic, and for diarrhea and spasmodic conditions." *Stedman's Medical Dictionary*, Opium (27th ed. 2000).

[26]   An impingement test is a "diagnostic test in which local anesthetic is injected into the subacromial space of a patient with impingement signs; relief of pain following the injection during provocative maneuvers is helpful in confirming the subacromial space as the source of the symptoms." *Stedman's Medical Dictionary*, Impingement test (27th ed. 2000).

opined that the evaluation showed a decrease in normal functional status and subjective and objective deficits could be addressed by physical therapy intervention. (*Id.*).

Isham presented to Anderson for physical therapy on January 28, 2013, and again on February 4, 2013. (*Id.* at 605–06). She was given bilateral ankle braces and was fitted with Powerstep orthotic inserts and a theraband for her shoulder.[27] (*Id.*).

On March 13, 2013, Anderson completed a discharge summary. (*Id.* at 606–07). He noted that Isham was seen for three visits, cancelled twice, and did not show for two appointments. (*Id.* at 607). As a result, treatment goals were not met and there was no significant improvement. (*Id.*).

### 3. Consultative Examinations[28]

#### a. Physical Consultative Examination

On April 4, 2013, Dr. Neil Johnson, MD ("Dr. Johnson"), conducted a physical examination of Isham. (*Id.* at 615–29). After going through Isham's family and medical history, Dr. Johnson performed a physical and neurological examination and concluded that Isham's sensory functions are intact, her reflexes are symmetrical, and noted no disorientation. (*Id.* at 617). He concluded that Isham's breath sounds were clear, and he expected her to be able to walk more than her self-reported limitation of one-fourth of a block. (*Id.*). Isham's hearing in her

---

The supraspinatus is the "intrinsic . . . muscle of shoulder joint, the tendon of which contributes to the rotator cuff[] . . . ." *Stedman's Medical Dictionary*, Supraspinatus (27th ed. 2000).

[27]     A TheraBand is a hand-therapy tool. *See* Theraband, www.thera-band.com (last visited Jan. 27, 2015).

[28]     A consultative examination takes place "[i]f [the claimant's] medical sources cannot or will not give [the SSA] sufficient medical evidence about [the claimant's] impairment for [the SSA] to determine whether [the claimant is] disabled or blind[]." 20 C.F.R. § 416.917. "[The SSA] may ask [the claimant] to have one or more physical or mental examinations or tests. [The SSA] will pay for these examinations. However, [the SSA] will not pay for any medical examination arranged by [the claimant or the claimant's] representative without [the SSA's] advance approval." *Id.*

left ear was damaged and hearing in her right ear was mildly damaged. (*Id.*). Dr. Johnson noted

she can talk on the phone using her right ear but not her left ear, and she has trouble in a group

setting. (*Id.*). Although a crossover microphone hearing aid was suggested, she was not using one

at the visit. (*Id.*). Isham could "hear conversational speech at [six] feet without trouble." (*Id.*). Dr.

Johnson found discomfort on motion of her ankles and "minimal crepitus of her knees." (*Id.* at

618).

Although Isham reported being able to stand less than one minute and walk only one-

fourth of a block, Dr. Johnson stated that "[p]hysical examination would suggest she should be

able to do more than this." (*Id.*). Dr. Johnson found that Isham cannot sit for very long because

she likely has ADHD. (*Id.*). Dr. Johnson also noted that Isham has a number of mental health

issues, "which appear[] to be her biggest problem in terms of gainful employment." (*Id.*). Isham

was pleasant, cooperative, and "maybe a little hyperactive[]" during the exam. (*Id.*).

### b.      Mental Consultative Examination

On March 28, 2013, Dr. Marlin Trulsen, PhD, LP ("Dr. Trulsen"), examined Isham's

mental status. (*Id*. at 608–14). Dr. Trulsen concluded:

> Ms. Isham's general mental capacity for understanding, remembering, following
> instructions, sustaining attention[,] and concentrating all appear adequate in
> development and show no general impairment. Her general mental capacity for
> carrying out work-like tasks with reasonable persistence or pace, responding
> appropriately to brief and superficial contact with coworkers and supervisors, as
> well as tolerating stress and pressures typically found in an entry-level workplace
> appear to demonstrate a moderate level of impairment per report of current mental
> health symptoms. Ms. Isham appears generally capable of completing
> requirements for her independent living as needed with limitations noted.
>           Ms. Isham appears capable of respecting authority to an average level with
> no impairment noted. Gait and station appeared average with no difficulties
> negotiating stairs, sitting, walking, or standing. She demonstrated an average
> ability to hear and produce normal conversation and sustain speech.

(*Id*. at 612–13). Dr. Trulsen assigned Isham a GAF score of 55. (*Id.* at 612).

### 4.      State Agency Medical Consultants' Opinions

Due to Isham's physical and mental impairments, state agency consultants assessed Isham's physical residual functional capacity ("RFC") and mental RFC. *See* (*id.* at 96–101).

### a.      Physical RFC Assessment

On June 17, 2011, Gerald Klyop, MD ("Dr. Klyop"), completed a physical RFC assessment. (*Id.* at 96–97). After reviewing Isham's medical file, Dr. Klyop opined that Isham could occasionally lift or carry fifty pounds, could frequently lift or carry twenty-five pounds, could stand or walk with normal breaks for about six hours in an eight-hour workday, could sit with normal breaks for about six hours in an eight-hour workday, and could push or pull an unlimited amount of weight. (*Id.*). Dr. Klyop opined that Isham had no postural, manipulative, visual, or communicative limitations. (*Id.* at 97). Dr. Klyop opined that Isham had environmental limitations, finding that she had asthma and should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (*Id.*).

At the reconsideration level on October 6, 2011, state agency consultant Gregory H. Salmi, MD ("Dr. Salmi"), reviewed the updated medical evidence record. (*Id.* at 458–60). Dr. Salmi affirmed Dr. Klyop's RFC, but noted that "the RFC should have environmental limitations to avoid concentrated exposure to loud noise." (*Id.* at 459).

### b.      Mental RFC Assessment

On June 28, 2011, Maura Clark, PhD ("Dr. Clark"), reviewed the medical record and completed a mental RFC assessment. (*Id.* at 97–99). With respect to memory and understanding, Dr. Clark concluded Isham's ability to remember locations and work-like procedures and her ability to understand and remember very short and simple instructions were not significantly limited. (*Id.* at 98). Her ability to understand and remember detailed instructions was moderately

limited. (*Id.*). Dr. Clark based her assessment on Isham's history of cognitive scores in the "BIF" range, and a work history of unskilled tasks.[29] (*Id.*).

With respect to concentration and persistence limitations, Dr. Clark found Isham was not significantly limited in her ability to carry out very short and simple instructions, to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*). Her ability to carry out detailed instructions and her ability to maintain attention and concentration for extended periods were moderately limited. (*Id.*). Dr. Clark's narrative stated that Isham's "[a]ttention and concentration are moderately impacted." (*Id.* at 98–99).

Dr. Clark also reported that Isham had social interaction limitations. (*Id.* at 99). Her ability to interact appropriately with the general public was limited moderately. (*Id.*). Isham's abilities to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior; and to adhere to basic standards of neatness and cleanliness were not limited significantly. (*Id.*). Dr. Clark explained these findings by stating,

> It appears that [Isham] would be able to manage occasional contact with the public but sustained, intensive, interpersonal contact would be precluded. [Isham] would appear to work best alone, in semi-isolation from others or as part of a small group. Totality of the [medical evidence record] suggests [Isham] seems to be able to maintain at least a minimal level of relationship with others.

---

[29]   Although not clear in the records, the Court presumes "BIF" refers to "borderline intellectual functioning." *See infra* Part III.B.; *see also* (Admin. R. at 19).

(*Id.*).

Dr. Clark stated that Isham has no adaption limitations and opined that Isham was able to: understand, carry out, and remember simple instructions; make judgments commensurate with functions of unskilled work; respond appropriately to brief supervision and interactions with coworkers and work situations; and deal with changes in the work setting. (*Id.*).

At the reconsideration level on October 4, 2011, state agency consultant Mary X. Sullivan, PhD ("Dr. Sullivan"), reviewed the updated medical evidence record. (*Id.* at 454–56). Dr. Sullivan affirmed Dr. Clark's RFC. (*Id.* at 455).

### D.     Vocational Expert Testimony

#### 1.     January 11, 2013 Hearing

Edward Utities ("Utities") testified as a vocational expert ("VE") before the ALJ at the hearing on January 11, 2013. *See, e.g.*, (*id.* at 79). He holds a BS degree from Northland College and a MS degree in counseling from the University of Wisconsin. (*Id.* at 156). Utities identified Isham's past employment as a cleaner, which is listed as a heavy and unskilled occupation, but he classified the job as light as Isham performed it. (*Id.* at 79). He also identified her past work as a flooring laborer, which is listed as very heavy and unskilled work but was performed at medium by Isham. (*Id.* at 79). Utities testified that a person who did not have the mental capacity to understand, remember, and follow instructions would not be able to work. (*Id.* at 80). Isham's attorney asked Utities the following hypothetical question:

> [Assume] she would frequently, meaning up to two-thirds of the time, be unable to maintain attention and concentration for extended periods of time, be unable to maintain regular attendance, be unable to work in coordination with or in proximity to others without being distracted by them, be unable to make simple work-related decisions, be unable to complete a normal workday and workweek without interruptions from psychologically based symptoms and be unable to perform at a consistent pace without an unreasonable number and . . . length of

rest periods. . . . If a person had that degree of impairment, would they be able to do competitive work?

(*Id.* at 80–81). Utities responded no. (*Id.* at 81).

### 2.     May 1, 2013 Hearing

Mary Harris ("Harris") testified as a VE before the ALJ on May 1, 2013. *See, e.g.*, (*id.* at 40). She holds a BS degree in psychology from St. Cloud State University and a MS degree in counseling, both from St. Cloud State University. (*Id.* at 193). Harris agreed with Utities that Isham's past employment as a cleaner is listed as a heavy and unskilled occupation. (*Id.* at 40). She disagreed with Utities's description of Isham's past employment as a floor installer; she stated that this position is listed as a medium and semi-skilled occupation with an SVP of 4, both as listed and as performed.[30] (*Id.*). The ALJ asked Harris the following hypothetical question:

> It involves a . . . lady who is approximately 50 years of age and would have this work history and a grade 11 education. And . . . her actual ability for application of . . . writing and reading and arithmetic would not be at that level. Assume it's at . . . least a grade nine level. . . .
>
> [H]er physical limitation is some impairment to . . . the left ear . . . with tinnitus or similar symptoms. Because of that, she would have the exertional limitation of no work at unprotected heights or in a dangerous industrial setting where there might be moving equipment, like forklifts. And based on that, medium exertion would be applicable, rather than no exertional limitations.
>
> Regarding mental health, . . . the worker needs a . . . clear-cut and rather well laid out work routine. Stated another way, she's not going to be one who can adapt to frequently changed circumstances or to multitasking or [a] requirement to often travel on common carriers as part of a job or occupation.
>
> Conversely, she can handle a well laid out routine with relatively clear one to about four or five-step instructions, nothing probably more detailed than that.

---

[30]     The Dictionary of Occupational Titles ("DOT") uses the term "Specific Vocational Preparation" ("SVP") to categorize occupations. *See* Dictionary of Occupational Titles, Appendix C: Components of Definition Trailer (4th ed. 1981), *available at* http://www.occupationalinfo.org/appendxc_1.html# II. SVP is the amount of time required by a typical worker to learn a specific job. *Id.* An SVP of 4 encompasses jobs that require training over three months, and up to and including six months. *Id.*

And she cannot do work requiring a great deal of collaboration with others during the workday at high levels. Conversely, she can handle routine and perfunctory social interaction as needed with coworkers, supervisors, and/or the retail public. She could respond to brief questions from retail customers if needed by a job or occupation.

 [S]he should not work in a place where there's concentrated exposure to irritants, gasses and so forth.

[P]lease analyze and then give us an opinion as to whether such a worker could do the past work in the Isham file.

(*Id.* at 40–41). Harris answered that the hypothetical individual would be able to do the work of a cleaner, as performed. (*Id.* at 41).

In response to questioning from the ALJ, Harris testified that the cleaning materials used to do the cleaning job would be non-toxic. (*Id.* at 48).

The ALJ asked Harris the following hypothetical question:

Assume that . . . the worker can't . . . use cleaners that would be toxic or . . . are likely to cause difficulties to the nostrils, to the breathing, et cetera or they require one to wear a mask, but normal household cleaners, over-the-counter cleaners can be used without limitation.

An excessively noisy environment cannot be tolerated, [such as] one with significant industrial noise or a setting similar to an active construction site. But assume the worker does not present with a need for [a quiet environment]. A normal . . . noise level one might experience in society, on the street, could be tolerated.

And finally, assume that she doesn't have . . . a sixth grade level education. It's much less than that, but at least marginal.

Would your answers previously given to the first [hypothetical] change?

(*Id.* at 49). Harris answered no, meaning that the hypothetical individual would be able to perform the job of a cleaner, as performed. (*Id.*).

Isham's attorney asked Harris if the hypothetical individual could work as a cleaner if the hypothetical individual could only tolerate exposure to humidity, wetness, dust, odors, fumes,

pulmonary irritants, extreme cold, extreme heat, and vibrations for up to one-third of the time. (*Id.* at 42). Harris answered that the hypothetical individual could not be a cleaner with these limitations. (*Id.*).

Isham's attorney asked Harris if the hypothetical individual could work as a cleaner if the hypothetical individual needed to work in a quiet environment, like a library. (*Id.* at 43). Harris answered that cleaners do not necessarily work with noisy machinery. (*Id.*). Harris testified that if Isham could only perform her flooring job with her boyfriend's supervision, that employment would be considered supportive, not competitive. (*Id.*).

Isham's attorney asked Harris the following question:

[S]he would frequently, up to one-third of the time, be unable to maintain regular attendance, unable to work in coordination with . . . or in proximity to others without being distracted by them, be unable to make simple work-related decisions, be unable to complete a normal workday and work week without interruptions from psychologically-based symptoms, [and] be unable to perform at a consistent pace without an unreasonable number and length of rest periods.

If she had all of those problems on a frequent basis, would she be able to do . . . the work you've described?

(*Id.* at 44). Harris answered that there would be no work available. (*Id.*).

Harris testified that if a person can stand or walk for four hours out of eight, occasionally balance and stoop, never be exposed to unprotected heights or moving mechanical parts or operate motor vehicles, carry eleven to twenty pounds occasionally, and lift twenty to fifty pounds occasionally, these restrictions would constitute a restricted range of work at the light exertional level. (*Id.* at 44–45). These restrictions are consistent with being a cleaner. (*Id.* at 45). Harris testified that a cleaner requires a reading ability of 2, which means "[r]ecognizing the meaning of 2,500 two or three-syllable words, reading at a rate of 95 to 120 . . . words per minute, print[ing] simple sentences, [and] mak[ing] simple sentences." (*Id.*). Harris testified that

someone who is functionally illiterate would be able to perform that job, based on her experience placing non-English-speaking people in cleaning jobs. (*Id.* at 46). She acknowledged that her testimony differs from the DOT in this respect. (*Id.*).

Isham's attorney asked Harris if there would be competitive employment for someone who missed work more than two times per month because of their mental impairments. (*Id.* at 47). Harris responded that, if these specific attendance problems were consistent every month, there would be no competitive employment for such an individual. (*Id.*).

Isham's attorney then asked Harris if an individual could work any of Isham's previous jobs if this individual needed more breaks than the usual fifteen-minute break in the morning, fifteen-minute break in the afternoon, and thirty- to sixty-minute break for lunch. (*Id.*). Harris responded that the individual could do the cleaning job, as performed, because of the casual atmosphere, variable hours and responsibilities, allowed breaks, and being on and off feet as needed. (*Id.*).

### E.     The ALJ's Decision

On May 17, 2013, the ALJ issued a decision finding Isham was not disabled. (*Id.* at 22–23). The ALJ reached his conclusion after evaluating this case based on the five-step process. *See* 20 C.F.R. § 416.920(a); *see also* (Admin. R. at 10–12). The ALJ considered: (1) whether Isham was engaged in substantial gainful activity; (2) whether Isham had a severe medically determinable impairment or a severe combination of impairments; (3) whether Isham's impairment or combination of impairments meets the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"); (4) whether Isham could perform the requirements of her past work; and (5) whether Isham could do any other work in light of her residual functional capacity, age, education, and work experience. *See* 20 C.F.R. § 416.920(a)–

(g); (Admin. R. at 10–12).

At the first step, the ALJ found that Isham had not engaged in any substantial gainful activity since the AOD. (Admin. R. at 12). The ALJ found that Isham had no recorded earnings since 2006. (*Id.*).

At the second step, the ALJ found that Isham had the following severe impairments: "severe pulmonary impairment, history of ankle injuries, left-sided sensorineural hearing loss, affective and learning-related disorders, and history of drug and alcohol abuse." (*Id.*).

At the third step, the ALJ determined Isham did not have an impairment or combination of impairments that met or medically equaled one of the Listings. (*Id.*). The ALJ found that Isham's ankle injuries did not meet or medically equal Listing 1.02, and her hearing impairments did not meet or medically equal Listing 2.10. (*Id.* at 12–13). The ALJ similarly found that Isham's pulmonary impairment did not meet or medically equal Listing 3.02. (*Id.* at 13).

The ALJ considered Isham's mental impairments, singly and in combination, but found that these impairments did not meet or medically equal the required criteria in Listings 12.02, 12.03, 12.04, 12.06, and 12.09.[31] (*Id.*). In making this determination, the ALJ explained that he considered whether the "paragraph B" requirements were satisfied.[32] (*Id.*). To meet "paragraph

---

[31]     Section 12 lists mental disorders in nine diagnostic categories. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A. Section 12.02 applies to organic mental disorders; section 12.03 applies to schizophrenic, paranoid, and other psychotic disorders; section 12.04 applies to affective disorders, section 12.06 applies to anxiety related disorders, and section 12.09 applies to substance addiction disorders.

[32]     The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months. . . . Each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There are additional functional criteria

B" requirements, a mental impairment must cause at least two of the following: (1) marked restriction of daily living activities; (2) marked difficulties in maintaining social function; (3) marked difficulties in maintaining concentration, persistence, or pace; (4) or repeated episodes of decompensation, each of extended duration.[33] (*Id.*). The ALJ found Isham had moderate limitations in activities of daily living; social functioning; and concentration, persistence, and pace. (*Id.*). Isham had no episodes of decompensation for extended duration. (*Id.*).

Because the ALJ did not find Isham's mental impairments caused at least two marked limitations or a marked limitation and repeated episodes of decompensation of extended durations, he found that the "paragraph B" criteria were not satisfied. (*Id.*). The ALJ then considered whether "paragraph C" criteria were satisfied.[34] (*Id.*). The ALJ determined that "the evidence fail[ed] to establish the presence of the 'paragraph C' criteria." (*Id.*).

Next, the ALJ determined Isham had the RFC

---

(paragraph C criteria) in 12.02, 12.03, 12.04, and 12.06, discussed herein. We will assess the paragraph B criteria before we apply the paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B criteria are not satisfied. We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied.

. . . .

The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description, that is manifested by the medical findings in paragraph A.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A.

[33]    The ALJ defined a marked limitation as "more than moderate but less than extreme." (Admin. R. at 13). The ALJ defined repeated episodes of decompensation, each of extended duration as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (*Id.*); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C4.

[34]    Paragraph C criteria "assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A.

to perform medium work as defined in 20 CFR [§] 416.967(c) except [Isham] cannot use cleaners that would be toxic, cause difficulty with breathing, or require someone to wear a mask; should not work at unprotected heights; and should not work in a dangerous industrial setting with moving equipment, in an environment with concentrated exposure to irritants or gasses, or in an environment that is excessively noisy such as a site with significant industrial noise or an active construction site. [Isham] has a marginal education and needs a clear cut and well laid out work routine with relatively clear instructions of up to five steps; cannot perform work requiring a great deal of collaboration with others; can handle routine and perfunctory social interaction as needed with coworkers, supervisors, and the retail public; and can respond to brief questions from retail customers if needed.

(*Id.* at 14). To make the RFC determination, the ALJ considered objective medical and opinion evidence, as well as Isham's symptoms that could reasonably be accepted as consistent with such evidence. (*Id.*).

The ALJ applied the requisite two-step test for considering Isham's symptoms. (*Id.*). First, the ALJ must determine "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could be expected to produce [Isham's] pain or other symptoms." (*Id.*). Second, the ALJ must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [Isham's] functioning." (*Id.*). When "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must determine the credibility of the statements based on the entire record. (*Id.*).

Following the above process, the ALJ found that Isham's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (*Id.*). The ALJ noted that Isham testified about her mental health problems as a child and her several suicide attempts. (*Id.* at 15). The ALJ also noted that Isham testified that she feels sad every day; she has problems sleeping; her ankles cause her problems, and she can only be on

her feet for five to ten minutes at a time; and she has problems concentrating, reading, and following instructions. (*Id.*).

The ALJ highlighted the following objective physical medical evidence to support his determination. Isham's ankle pain improved with the use of braces, and she had an above-average activity level with regular exercise. (*Id.* at 16). In October 2010, Isham was sober, and she reported her overall health was good. (*Id.*). A few months later, she reported headaches and shortness of breath and wheezing, but had a normal examination with normal respiratory effort and intact balance and gait. (*Id.*). She received medicine for her asthma. (*Id.*). In August 2011, Isham had a "normal physical evaluation with [a] normal respiratory system, full range of motion (ROM) and no deformity or swelling of her feet, and normal extremities." (*Id.*). In January 2012, after complaining of lower back pain, Isham had some "tenderness and decreased ROM in her back, but she had an otherwise normal physical examination with intact lower extremity mobility, strength, and sensation." (*Id.*). In July 2012, Isham had unremarkable computed tomography scans ("CT") of her head and cervical spine.[35] (*Id.*). That same month, Isham had a normal physical evaluation, and she denied having shortness of breath or any physical pain. (*Id.*). In December 2012, after complaining of ankle pain, Isham had a normal physical evaluation, and her feet were normal with full ROM, no deformity, and no swelling, but she was offered physical therapy for her ankle pain. (*Id.*). In January 2013, imaging of Isham's ankles was negative; she had normal joint spaces and alignment with unremarkable soft tissues. (*Id.*). Isham had physical therapy for ankle and shoulder pain, and her prognosis was good. (*Id.*). She had a good response to treatment and reported improved symptoms with the ankle braces, however, she "cancelled

---

[35]     A CT scan refers to the "imaging anatomic information from a cross-sectional plane of the body, each image generated by a computer synthesis of x-ray transmission data obtained in many different directions in a given plane." *Stedman's Medical Dictionary*, Tomography, Computed Tomography (CT) (27th ed. 2000).

appointments, did not show up, and did not return for more physical therapy." (*Id.*).

The ALJ noted that Isham had a history of hearing loss. (*Id.*). Specifically, in 2007, Isham had sensorineural hearing loss on the left side. (*Id.*). In September 2011, Isham had "bilateral hearing loss with nerve-type damage on the left side and mild nerve-type damage on the right side" that a hearing aid may help. (*Id.*). Isham may have difficulty in noisy environments or with soft voices. (*Id.*).

The ALJ stated that Isham underwent a psychological consultative examination in April 2013. (*Id.* at 17). The examiner found that Isham "had average gait with no difficulties negotiating stairs, sitting, walking, or standing; she had average ability to hear and produce normal conversation and sustain speech." (*Id.*).

The ALJ considered Isham's physical consultative examination with Dr. Johnson from April 2013. "Dr. Johnson noted that [Isham] had no problems communicating with him from six to eight feet away." (*Id.*). Dr. Johnson found that Isham was cooperative and walked normally, but she had moderate difficulty with tandem walking and squatting. (*Id.*). He determined Isham "should be able to walk more than [one-fourth] of a block." (*Id.*). Dr. Johnson reported that Isham could lift fifty pounds occasionally and twenty pounds frequently; she could carry twenty pounds occasionally and ten pounds continuously. (*Id.*). Dr. Johnson opined that Isham could sit for eight hours, stand for four hours, and walk for four hours in an eight-hour workday. (*Id.*). He opined that Isham could "occasionally perform postural adjustments and should avoid unprotected heights, moving mechanical parts, and operation of a motor vehicle." (*Id.*). Dr. Johnson opined that Isham should "only have occasional exposure to humidity, irritants, vibration, or extreme temperatures"; she needs to work in a quiet environment, but she could "perform all identified activities of daily living." (*Id.*).

The ALJ gave "weight" to Dr. Johnson's opinions because they are consistent with the record. (*Id.*). However, the limitations related to only occasional exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme temperatures, and vibrations were given "little weight" because the record showed Isham's breathing difficulties are minor. (*Id.*). Based on the record, the ALJ stated that Isham is "more appropriately restricted from using [toxic] cleaners . . ., cause difficulty breathing, or require someone to wear a mask, and [she] should not work in an environment with concentrated exposure to irritants or gasses." (*Id.*).

The ALJ highlighted the following objective mental medical evidence to support his determination. First, the ALJ described Isham's history and treatment of alcohol abuse and noted that she functioned well when she was sober. *See* (*id.* at 18).

In March 2011, Isham had a mental health evaluation with Dr. Horvat. (*Id.* at 19). Isham underwent cognitive testing and received a full-scale IQ score of 72, which is in the borderline range of intellectual functioning. (*Id.*). Dr. Horvat diagnosed Isham with "alcohol dependence; bereavement; PTSD; ADHD; bipolar disorder; and delusional disorder." (*Id.*). He opined that Isham was "not capable of handling funds, but she could do routine, repetitive, labor-intensive work" and "can tolerate routine stresses and brief and superficial interaction with others." (*Id.*). He opined that Isham's ADHD likely interferes with her attention and concentration and that she was unable to understand, remember, and follow instructions. (*Id.*).

The ALJ gave "weight" to Dr. Horvat's opinions because his opinions are consistent with the record. (*Id.*). The ALJ gave "little weight" to Dr. Horvat's opinion that Isham cannot understand, remember, and follow instructions because the record shows that Isham functions well when sober and had normal mental status examinations. (*Id.*).

At the April 2013 mental consultative examination, Dr. Trulsen reported Isham's

"memory was adequate, and her intellectual functioning was estimated to be in the borderline range." (*Id.*). Dr. Trulsen diagnosed Isham with "panic disorder; anxiety disorder, NOS; dysthymic disorder; personality disorder, NOS; bereavement, provisional; and alcohol dependence, in sustained partial remission." (*Id.*). Dr. Trulsen noted that Isham had "no general impairment in understanding, remembering, and carrying out instructions and sustaining attention and concentration." (*Id.*). He opined that Isham had "moderate impairment with mental capacity for work activities, but she was capable of completing the requirements for independent living as needed." (*Id.*). The ALJ gave "significant weight" to Dr. Trulsen's opinions because his opinions are consistent with the record. (*Id.*).

The ALJ considered the statement from Ms. Nelson, who reported that Isham struggles with chemical dependency and she struggles with memory recall even during sobriety. (*Id.*). Ms. Nelson opined that Isham was "unable to maintain concentration, persistence, or pace or complete a normal workday or workweek." (*Id.*). She noted that Isham had "difficulty with concentration, remembering instructions, and performing activities within a schedule." (*Id.*). She stated that Isham could follow "work-like procedures with expectations clearly defined on a regular and routine basis." (*Id.*).

From April 2010, to September 2011, Isham received treatment from Schoenfeld. (*Id.* at 18). She stated that Isham's mental health problems were prominent even during sobriety. (*Id.* at 20). Schoenfeld noted that Isham had "extreme limitations in concentration, persistence, and pace." (*Id.*). She diagnosed Isham with major depressive disorder; anxiety; and substance dependence, and believed Isham to be disabled. (*Id.*). She reported that Isham had no "limitation performing activities of daily living, mild difficulties maintaining social functioning, and extreme limitation with concentration, persistence, or pace." (*Id.*).

36

The ALJ gave "little weight" to Ms. Nelson and Schoenfeld's opinions because their opinions were influenced by "self-report[s] of an unreliable historian and [were] not supported by standardized psychological testing." (*Id.*). The ALJ noted that Isham had no history of inpatient mental health treatment, and Ms. Nelson's and Schoenfeld's opinions are contradicted by the opinions of the state agency psychological consultants, who are acceptable medical sources. (*Id.*).

The ALJ found that Isham's "activities of daily living, social functioning, and concentration, persistence, and pace are . . . not as limited as she alleges." (*Id.*).

With respect to activities of daily living, Isham showed an ability to independently initiate and sustain many activities, such as household chores, preparing her own meals, performing her own personal care, cleaning, doing dishes, cooking, doing laundry in the bathtub, rake, shovel, and completing lawn care. (*Id.*). The ALJ determined she only has "moderate limitations in activities of daily living." (*Id.*).

With respect to social functioning, the ALJ found Isham can interact with others as necessary and has an adequate social life. (*Id.*). Isham shops when fewer people are present, but prefers to shop with someone to reduce her anxiety. (*Id.*). Isham's doctors describe her as cooperative, pleasant, and able to interact and answer questions without great difficulty. (*Id.*). Because she showed her mental impairments limit some social interactions, the ALJ determined she has "moderate limitations in social functioning." (*Id.*).

With respect to concentration, persistence, and pace, the ALJ found there is evidence Isham participates in activity that is suggestive of good concentration and persistence, such as saying the alphabet, telling time, counting to 100, and completing financial transactions when necessary. (*Id.*). The ALJ noted Isham's difficulty handling stress due to her anxiety, and

determined she has moderate limitations in concentration, persistence, and pace. (*Id.* at 21).

The ALJ noted that the state agency psychological consultants supported his findings with respect to activities of daily living; social functioning; and concentration, persistence, and pace, which, in turn, were consistent with the record. (*Id.*). The ALJ concluded that Isham

> has a marginal education and needs a clear cut and well laid out work routine with relatively clear instructions of up to five steps; cannot perform work requiring a great deal of collaboration with others; can handle routine and perfunctory social interaction as needed with coworkers, supervisors, and the retail public; and can respond to brief questions from retail customers if needed.

(*Id.*).

At step four, the ALJ determined, based on Isham's RFC, that she was capable of performing her past relevant work as a cleaner. (*Id.*). The ALJ noted that Isham's past jobs did not exceed the exertional level of her RFC because all of Isham's past work was performed at the light level and none exceeded the RFC's limitations. (*Id.*). The ALJ relied on Harris's testimony to determine Isham could perform past work as actually and generally performed.[36] (*Id.*).

At step five, the ALJ concluded that there are other jobs existing in the national economy that Isham is able to perform considering her age, education, work experience, and RFC, relying on Harris's testimony. (*Id.* at 21–22). Therefore, the ALJ found that Isham was not disabled under 20 C.F.R. § 416.920(f). (*Id.* at 22–23).

## II.   STANDARD OF REVIEW

The standards governing the award of Social Security benefits are congressionally mandated: "The Social Security program provides benefits to people who are aged, blind, or who suffer from physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial

---

[36]   The ALJ appears to use "the vocational expert" to refer to Harris, who is the VE who testified at the second hearing. *See* (Admin. R. at 21, 40–49).

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial work which exists in the national economy. . . ." *Id.* § 423(d)(2)(A).

### A. Administrative Record

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision. 20 C.F.R. § 416.1409(a). A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. § 416.1429. If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic. *Id.* § 416.1467. If the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant, unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action. 42 U.S.C. § 405(g); 20 C.F.R. § 416.1481.

### B. Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). The Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)). A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). Yet this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> Substantial evidence is merely such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Substantial evidence on the record as a whole, however, requires a more scrutinizing analysis. In the review of an administrative decision, [t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (citation and internal quotation marks omitted).

In reviewing the ALJ's decision, the Court analyzes the following factors: (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v. Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. § 416.912(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on the record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). The Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III. DISCUSSION

Isham makes the following arguments: (1) the ALJ failed to evaluate Schoenfeld's and Ms. Nelson opinions according to the law and failed to explain the weight given to their opinions; (2) the ALJ failed to find borderline intellectual functioning was a severe impairment; (3) the ALJ's conclusion that Isham does not meet Listing 12.05C, addressing intellectual disability, is not supported by substantial evidence in the record as whole;[37] (4) the ALJ's determination that Isham's employment as a cleaner is not supported by substantial evidence; (5) the ALJ's finding that Isham has marginal education is not supported by the record as a whole; and (6) the ALJ's determination that Harris's testimony is consistent with the DOT is not supported by substantial evidence in the record as a whole. *See* (Pl.'s Mem. in Supp. of Mot. for

---

[37]     At the time of Isham's hearing, the Listing for 12.05C was called "mental retardation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (effective June 13, 2012). The federal regulations now describe this listing as "intellectual disability." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (effective Sept. 3, 2013). The only change to this listing is the phrase "intellectual disability" instead of "mental retardation." The Court recognizes that the term "mental retardation" is disfavored at best and offensive at worst. The Court uses "intellectual disability" instead of "mental retardation" unless directly quoting another source. Additionally, because the substantive requirements for Listing 12.05C did not change, the Court does not specify the year of cited the Listing unless relevant to the analysis.

Summary J., "Isham's Mem. in Supp.") [Doc. No. 21 at 29–38]. The Court addresses each argument in turn.

### A.      Evaluation of Social Workers' Opinions

Isham argues the ALJ did not evaluate Schoenfeld's and Ms. Nelson's (collectively, the "Social Workers") opinions as required by the SSA. (*Id.*). Specifically, Isham argues the ALJ should have given their opinions more weight and their opinions do not contradict the non-examining state agency consultants' opinions. (*Id.* at 31). Isham also argues their opinions are consistent with disability, specifically relying on Isham's GAF scores, history of suicide attempts, and Dr. Horvat's finding that Isham could not understand, remember, and follow directions. (*Id.* at 31–32). The Commissioner argues the length of the Social Workers' treating relationships with Isham do not "rehabilitate otherwise unsupported opinions from 'other' sources," and Isham has not made a compelling argument that the state agency consultants' review of the Social Workers' opinions would have changed their mind. (Comm'r's Mem. in Supp. of Mot. for Summary J., "Comm'r's Mem. in Supp.") [Doc. No. 29 at 13]. Finally, the Commissioner argues that Isham's GAF scores and suicide attempts do not support a finding of disability, and the ALJ properly discredited Dr. Horvat's finding regarding Isham's concentration, persistence, and pace. (*Id.* at 14–15).

According the SSA, the Social Workers are not "acceptable medical sources." *See* 20 C.F.R. § 416.913(a) (listing types of acceptable medical sources); *Titles II and XVI: Considering Opinions & Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, SSR 06-3p, 71 Fed. Reg. 45593-03, 45594 (Aug. 9, 2006) (listing licensed clinical social workers as a medical source within the broader category of "other

sources," i.e., not acceptable medical sources). Nonetheless, the SSA considers all the evidence in the record, including opinions of medical sources who are not "acceptable medical sources." SSR 06-3p, 71 Fed. Reg. at 45595. The SSA determined that an ALJ should consider the same factors when evaluating both "acceptable medical sources" and medical sources who are not "acceptable medical sources." *Id.* These factors include:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source has a specialty area of expertise related to the individual's impairment(s); and
- Any other factors that tend to support or refute the opinion.

*Id.* The record "should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources.'" *Id.* at 45596. Additionally, "the adjudicator generally should explain the weight given to opinions from these 'other sources[.]'" *Id.* Not all factors apply in each case, and "[t]he evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts of the case." *Id.* at 45595–96.

Here, the ALJ did not explain his decision to give the Social Workers' opinions little weight by explaining each factor identified in SSR 06-3p. *See* (Admin. R. at 19–20). Instead, the ALJ explained that he gave the Social Workers' opinions little weight for the same reasons: "they were apparently influenced by self-report[s] of an unreliable historian and are not supported by standardized psychological testing. Additionally, [Isham] has no history of inpatient mental health treatment and these opinions are contradicted by the opinions of the state agency psychological consultants, acceptable medical sources." (*Id.*) (discussing Ms. Nelson's opinion that Isham is "unable to maintain concentration, persistence, or pace or complete a

43

normal workday or workweek" and "had difficulty with concentration, remembering instructions, and performing activities within a schedule."); *see also* (Admin. R. at 20) (discussing Schoenfeld's opinion that Isham has "extreme limitations in concentration, persistence, and pace"). Where, as here, the ALJ did not explicitly discuss all factors, this Court's task is to determine whether "the ALJ's explanation provides sufficient justification for his decision to give little weight" to Schoenfeld's and Ms. Nelson's opinions. *See Dew v. Comm'r of Soc. Sec.*, Civil No. 09-1986 (JMR/JJK), 2010 WL 3033779, at *19 (D. Minn. July 9, 2010), *report and recommendation adopted by* 2010 WL 3033772 (July 26, 2010).

The ALJ's analysis takes into consideration some of the factors articulated by the SSA. *See* SSR 06-3p, 71 Fed. Reg. at 45595. First, the ALJ noted whether the Social Workers' opinions are consistent with other evidence, namely the state agency psychological consultants' opinions. (Admin. R. at 19–20). Second, the ALJ considered "[t]he degree to which [the Social Workers] present[ed] relevant evidence to support [their] opinion[s,]" i.e., the Social Workers relied on Isham's self-reports. (*Id.*); SSR 06-3p, 71 Fed. Reg. at 45595. Elsewhere in his decision, the ALJ described Isham's "statements concerning the intensity, persistence and limiting effect of [her] symptoms" as "not entirely credible." (Admin. R. at 14). Isham does not dispute the ALJ's credibility determination with respect to her own statements. *See generally* (Isham's Mem. in Supp.). Third and finally, the ALJ considered "other factors that tend[ed] to . . . refute the opinion," namely, that Isham had "no history of inpatient mental health treatment." SSR 06-3p, 71 Fed. Reg. at 45595; (Admin. R. at 19–20).

Isham argues the Social Workers' opinions are entitled to "more weight than the opinions of an 'acceptable medical source'" under SSR 06-3p because they were treating mental health professionals. (Isham's Mem. in Supp. at 31). While an ALJ may certainly consider this treating

relationship as a factor in evaluating opinions, the ALJ was not **compelled** to find that the Social Workers' opinions were entitled to more weight. *See* SSR 06-3p. It is not the providence of this Court to resolve conflicts of evidence; that question is reserved to the ALJ. *Travis v. Astrue*, 477 F.3d 1037, 1041–42 (8th Cir. 2007). Here, the ALJ found conflicts between the Social Workers' reports and the state agency consultants' opinions, and found the state agency consultants' opinions more credible. *See* (Admin. R. at 19–20). Specifically, the ALJ explained that Schoenfeld's and Ms. Nelson's opinions were based on Isham's reports, and he found Isham not fully credible. (*Id.* at 14, 19–20). Additionally, the state agency psychologist consultant found that Isham, contrary to Schoenfeld's and Ms. Nelson's opinions, was able to "understand, carry out and remember simple instructions; . . . make judgments commensurate with functions of unskilled work; . . . respond appropriately to brief supervision and interactions with coworkers and work situations"; and deal with changes in the work setting. (*Id.* at 99).

Isham argues Schoenfeld's and Ms. Nelson's opinions could not "'contradict'" the state agency consultant's opinion because the state agency consultant had not reviewed "treating source evidence." (Isham's Mem. in Supp. at 31). In support, Isham cites SSR 96-6p for the following statement: "'the opinions of State agency . . . (medical consultants) can be given weight only insofar as they are supported by evidence in the case record . . . **including any evidence received at the administrative law judge . . . levels that was not before the State agency** . . . .'" (*Id.*) (quoting *Titles II & XVI: Consideration of Admin. Findings of Fact by State Agency Med. and Psychological Consultants & Other Program Physicians & Psychologists at the Admin. Law Judge & Appeals Council Levels of Admin. Review; Med. Equivalence*, SSR 96-6p, 61 Fed. Reg. 34466-01, 34467 (July 2, 1996)) (emphasis in Isham's Mem. in Supp.). Isham offers no support for the idea that had the state agency consultant viewed "treating source

evidence," her opinion would have changed. *See* (Comm'r's Mem. in Supp. at 13). Additionally, a treating source is only entitled to "more weight" when it is a medical opinion. *See* 20 C.F.R. § 416.927(a)(2) (defining medical opinions as "statements from physicians and psychologists or other acceptable medical sources"); § 416.927(c)(2) (describing how medical opinions may be weighted based on the treatment relationship). Because social workers are not acceptable medical sources, the more appropriate method of evaluating their opinions is in accordance with the factors discussed in SSR 06-3p, as described and analyzed above. *See Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (evaluating treating therapist's assessment as "'other medical evidence'" and not "an 'acceptable medical source'").

Finally, Isham argues Schoenfeld's and Ms. Nelson's opinions are consistent with the record. (Isham's Mem. in Supp. at 31). Isham specifically refers to her GAF scores in the range of 30 to 50, her history of suicide attempts, and Dr. Horvat's finding, as an acceptable medical source, that Isham "did not have the mental capacity to understand, remember[,] and follow instructions." (*Id.* at 31–32) (citing Admin. R. at 386). Isham's argument ignores the fact that the ALJ's evaluation specifically relied on the Social Workers' findings about Isham's functionality, and contrasted it with one specific inconsistency: the state agency psychological consultants' opinions. *See* (Admin. R. at 19–20). Where the state agency psychological consultant found only moderate limitations in functional areas, Schoenfeld and Ms. Nelson found extreme limitations in concentration, persistence, and pace. *See* (*id.* at 98–99, 552–53, 558–59).

Specifically, Dr. Clark, the state agency consultant who provided a mental RFC assessment, found moderate limitations in the categories of ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; and ability to interact appropriately with the public. (*Id.* at

98–99). She found no significant limitations in the other categories. *See* (*id.* at 98–99). In contrast, Schoenfeld found Isham was frequently unable to do the following: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods of time; maintain regular attendance; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. *See* (*id.* at 552–53). Ms. Nelson found Isham was frequently unable to do the following: understand and remember detailed instructions; carry out detailed instructions; maintain regular attendance; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; and set realistic goals or make plans independently of others. *See* (*id.* at 558–60). Therefore, the ALJ's determination that Schoenfeld's and Ms. Nelson's opinions contradict the state agency consultant's opinions with respect to the above areas of functioning is supported by the record.

The Court finds that the ALJ gave sufficient explanation as required by SSR 06-3p. *See* 71 Fed. Reg. at 45596; *Dew*, 2010 WL 3033779, at *19. Therefore, the ALJ did not err in giving Schoenfeld's and Ms. Nelson's opinions little weight.

### B.       Borderline Intellectual Functioning

Isham argues that the ALJ failed to include her borderline intellectual functioning as a severe impairment, and that the ALJ's decision cannot be affirmed because "[t]he hypothetical to

the vocational expert failed to describe the concrete consequences of [Isham's] borderline intellectual functioning[.]" (Isham's Mem. in Supp. at 29–30). In her reply, Isham points to several places in the record where she was diagnosed with borderline intellectual functioning. (Pl.'s Reply to Def.'s Mem. in Supp. of Mot. for Summary J., "Isham's Reply") [Doc. No. 30 at 2–3]. The Commissioner argues the ALJ implicitly rejected Isham's IQ score based on her activities of daily living and by finding she had a learning-related disorder, and this decision was supported by the record. (Comm'r's Mem. in Supp. at 5–6). The Commissioner also argues the RFC and questions to the VE are supported by substantial evidence because the ALJ explicitly considered Isham's functional illiteracy and incorporated it in making his determination that Isham was capable of her past relevant work and work in the national economy. (*Id.* at 6–7).

"A diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence." *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007). When this diagnosis is supported by the record, a claimant is entitled to have a vocational expert consider borderline intellectual functioning with her other impairments to determine how it affects her RFC. *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 297 (8th Cir. 1996).

The record reflects medical evidence that Isham was diagnosed with borderline intellectual functioning. *See* (Admin. R. at 384, 611). First, in March 2011, Dr. Horvat found Isham had a full-scale IQ score of 72. (*Id.* at 384). The ALJ found this score means she had borderline intellectual functioning. (*Id.* at 19); *see also* DSM-IV 684 (stating that "borderline intellectual functioning" is "an IQ in the 71–84 range."). The ALJ found Dr. Horvat's opinions were "given weight," except with respect to his opinion about Isham's ability to understand, remember, and follow instructions. (Admin. R. at 19). Second, in April 2013, Isham had a

48

consultative exam with Dr. Trulsen, who estimated Isham's IQ to be in "the borderline range," based on his review of historical documents and Isham's general use of language skills. (*Id.* at 611). The ALJ found Dr. Trulsen's opinions consistent with the record and assigned them "significant weight." (*Id.* at 19). In other words, the ALJ did not discredit any of the sources that diagnosed Isham with borderline intellectual functioning. *Cf.* (Comm'r's Mem. in Supp. at 6) ("[T]he ALJ implicitly rejected the IQ scores when he found Plaintiff had a learning-related disorder, but not borderline intelligence."). Thus, the record reflects diagnoses of borderline intellectual functioning. Under Eighth Circuit law, borderline intellectual functioning should have been considered a severe impairment, and a vocational expert should have considered Isham's borderline intellectual functioning, along with Isham's other impairments, in making a determination about Isham's ability to perform past relevant work or work in the national economy. *See Nicola*, 480 F.3d at 887; *Lucy*, 113 F.3d at 909; *Pickney*, 96 F.3d at 297.

As discussed in further detail below, the Court recommends remanding this case for consideration of Listing 12.05C, which should have occurred at step three of the ALJ's analysis. Whether or to what extent the ALJ erred in his RFC determination or hypothetical to the VE is an analysis that occurs during the Court's review of later steps in the process. *See* 20 C.F.R. § 416.920(e); *see, e.g.*, *Johnson v. Comm'r of Soc. Sec.*, Civil No. 11-cv-1268 (JRT/SER), 2012 WL 4328413, at *21 (D. Minn. July 11, 2012) (citing *Bondurant v. Astrue*, No. 09cv328 (ADM/AJB), 2010 WL 889932, at *2 (D. Minn. Mar. 8. 2010)) *report and recommendation adopted by* 2012 WL 4328389 (Sept. 20, 2012) ("[T]he failure to find additional impairments at Step Two does not constitute reversible error when an ALJ considers all of a claimant's impairments in the remaining steps of a disability determination."). Because a person who meets a Listing is disabled and no further analysis is necessary, any analysis of these issues may

become moot if, on remand, the ALJ finds Isham meets Listing 12.05C. 20 C.F.R. § 416.920(a)(iii). For this reason, the Court does not determine whether the ALJ's error was harmless.

### C.     Listing 12.05C

Isham argues the ALJ erred in his determination that her impairments do not meet or equal Listing 12.05C. (Isham's Mem. in Supp. at 32–34). Specifically, Isham argues her adaptive functioning was impaired before age 22 and the ALJ found that she had other impairments that impose significant work-related limitations. (*Id.* at 33). Additionally, she argues the ALJ should have considered the SSA's Program Operations Manual System ("POMS") instruction on medical equivalence for Listing 12.05C. (*Id.* at 33–34). The Commissioner contends Isham does not develop her argument regarding 12.05C's requirement that she suffer limitations as a result her additional impairments, the POMS section specifies that "a medical equivalence determination would very rarely be required," the ALJ implicitly rejected Isham's IQ score of 72, and her evidence does not support the deficient level of adaptive functioning required by Listing 12.05C. (Comm'r's Mem. in Supp. at 9–12).

The administrative hearing is not an adversarial proceeding. *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994). A plaintiff has the burden of proof to establish that he or she meets or equals a listed impairment. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530–31 (1990)). The ALJ has a duty to fully develop the record and that duty is independent of the claimant's burden to press his case. *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 824 (8th Cir. 2008) (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)).

At the time of the ALJ's decision, Listing 12.05C stated:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . .
>
> C.      A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2012). The Eighth Circuit held the introductory language is mandatory, and therefore, the impairment must have begun before the age of 22. *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006). In other words, the following four elements are required: "(1) deficits in adaptive functioning; (2) evidence of initial manifestation before age 22; (3) a valid verbal, performance or full-scale IQ score between 60 and 70; and (4) 'a physical or other mental impairment imposing an additional and significant work-related limitation of function.'" *Contreras v. Astrue*, Civil No. 08-1196 (DWF/JJK), 2009 WL 5252828, at *6 (D. Minn. Aug. 26, 2009) (quoting 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.05C). With respect to the connection between intellectual disability and the ability to work, "the issue is not whether the claimant can perform gainful activity; rather, it is whether he has an . . . impairment, other than his conceded mental impairment, which provides significant work-related limited function." *Maresh*, 438 F.3d at 901 (omission in original) (internal quotation marks omitted). "An impairment imposes significant limitations when its effect on a claimant's ability to perform basic work is more than slight or minimal." *Cook v. Bowen*, 797 F.3d 687, 690 (8th Cir. 1986). An impairment that is severe under step two meets the "significant limitations" standard in Listing 12.05C. *Id.* at 690–91; *see also Monroe v. Astrue*, 848 F. Supp. 2d 961, 980–84 (D. Minn. 2011) (MJD/JSM) (thoroughly analyzing the Eighth Circuit's history of interpreting the

"significant limitations" portion of Listing 12.05C and concluding that "an impairment will be deemed to impose an additional and significant work-related limitation of function if the impairment is 'severe' as defined by [20 C.F.R.] § 416.920(c).").

An impairment is medically equivalent to a Listing when "it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). The POMS provides specific instructions with respect to the medical equivalence of Listing 12.05C:

> Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g., 70–75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

POMS DI § 24515.056, at D1, *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/ 0424515056 (last visited Jan. 28, 2015). The Eighth Circuit has instructed ALJs to consider POMS. *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003) (citing *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000); *List v. Apfel*, 169 F.3d 1148, 1150 (8th Cir. 1999)).

Isham did not specifically claim intellectual disability as a disabling illness, injury, or condition.[38] (Admin. R. at 88). During the administrative process, however, her counsel repeatedly requested consideration under Listing 12.05C. *See* (*id.* at 325) (counsel's pre-hearing brief dated January 11, 2013, stating Isham's "combined mental impairments, including a full scale IQ of 72, also merit a finding that her impairments are equal in severity to 12.05C"); (*id.* at 59) (counsel's oral argument to the ALJ on January 11, 2013, that Isham's "impairments are equal in severity to [L]isting 12.05" and later referring to 12.05C specifically); (*id.* at 50–51)

---

[38]     Isham did list, however, "Dyslexia/illiteracy" as a disabling condition. (Admin. R. at 88). Arguably, this is similar to decreased intellectual functioning.

(counsel's oral argument to the ALJ on May 1, 2013, that Isham's "impairments are equal in severity to [L]isting 12.05[C].").[39] Nothing in the ALJ's decision suggests that he considered Listing 12.05C. *See* (*id.* at 13) (stating that the ALJ considered the following mental impairment Listings: 12.02, 12.03, 12.04, 12.06, and 12.09). Because the ALJ was on notice from the hearings and counsel's brief that mental retardation under Listing 12.05C was at issue, the ALJ should have considered Listing 12.05C. *Rodgers v. Astrue*, Civil No. 09-1214 (DWF/SRN), 2010 WL 3385086, at *15 (D. Minn. July 14, 2010) ("At the administrative hearing, Plaintiff's counsel put the ALJ on notice that Plaintiff's possible mental retardation under Listing 12.05(C) was at issue. The ALJ therefore, should have addressed that listing in his analysis."), *report and recommendation adopted by* 2010 WL 3385087 (Aug. 23, 2010).

This Court's task is to determine whether substantial evidence supports the ALJ's decision, and "an ALJ's failure to adequately explain his factual findings is not a sufficient reason for setting aside an administrative finding where the record supports the overall determination." *Scott*, 529 F.3d at 822 (internal quotation marks omitted); *see also* 42 U.S.C. § 405(g). Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. But here, the ALJ did not consider Listing 12.05C, and therefore, the ALJ's findings are insufficient to allow the Court to conclude that substantial evidence supports the ALJ's decision. *See Chunn v. Barnhart*, 397 F.3d 667, 672 (8th

---

[39]     The Commissioner cites, without argument, an Eighth Circuit case for its "holding that Listing 12.05 was not met where, among other things, the claimant 'did not initially claim mental retardation.'" (Comm'r's Mem. in Supp. at 12) (quoting *Clay v. Barnhart*, 417 F.3d 922, 929 (8th Cir. 2005)). But in *Clay*, the claimant not only did not claim intellectual disability, but the court found there was no evidence that she met the requirement to show onset before age 22, and there was no "record of treatment, diagnosis, or even inquiry into a mental impairment prior to applying for benefits." *Clay*, 417 F.3d at 929. As discussed in greater detail in this section, the same cannot be said for the record in the instant case, and therefore, *Clay* is not persuasive on this point.

Cir. 2005) ("The ALJ failed to support his finding on step three that Chunn's impairments did not equal a listed impairment, and it is not clear from his decision that he even considered whether Chunn met the requirements for listing 12.05C. For these reasons, the case must be remanded for further consideration and findings . . . .").

The medical evidence suggests at least circumstantial evidence that Isham's impairments might meet or be medically equivalent to Listing 12.05C. *See A.R.M. ex rel. Morlock v. Astrue*, Civil No. 12-cv-322 (DWF/SER), 2013 WL 785627, at *16 (D. Minn. Jan. 10, 2013) (remanding for further consideration when there was "circumstantial medical evidence" that the claimant met Listing 12.05C and the ALJ's decision did not "mention Listing 12.05, nor . . . otherwise indicate that [the ALJ] considered the listing to be relevant to [the claimant's] disability claim), *report and recommendation adopted by* 2013 WL 785756 (Mar. 1, 2013).

### 1.    Deficits in Adaptive Functioning

The record reflects that Isham has deficits in adaptive functioning as required by Listing 12.05C. The ALJ found that Isham has moderate limitations in the "paragraph B" areas of activities of daily living; social functioning; and concentration, persistence, and pace. (Admin. R. at 20–21). While this finding is not dispositive of Isham's deficits in adaptive functioning, "paragraph B" criteria are important considerations in whether Isham meets the requirement of Listing 12.05C. *See Contreras*, 2009 WL 5252828, at *6–7 (citing *Durden v. Astrue*, 586 F. Supp. 2d 828, 832 (S.D. Tex. 2008)).[40] Additionally, the fact that the ALJ found Isham has

---

[40]     As noted by another case in this District, the court in *Contreras* "discussed and relied extensively upon the record regarding how the plaintiff lived and functioned and how the 'overwhelming evidence' showed that he suffered from deficits in several kinds of adaptive functioning." *Perryman v. Colvin*, Civil No. 12-247 (MJD/JSM), 2013 WL 4435385, at *19 (D. Minn. Aug. 16, 2013) (quoting *Contreras*, 2009 WL 5252828, at *10) (adopting the report and recommendation of the Honorable Janie S. Mayeron, United States Magistrate Judge). In other

moderate limitations in these areas, instead of marked limitations, does not detract from the import of these findings. If marked limitations in these categories were required, Listings 12.05C and 12.05D would be redundant.[41] *Contreras*, 2009 WL 5252828, at *10. For this reason, the cases that the Commissioner cites for the proposition that Isham must demonstrate deficits in adaptive functioning that result in significant limitations are not persuasive. *See* (Comm'r's Mem. in Supp. at 10).

### 2.      Onset Before Age 22

The evidence demonstrates that Isham went to school through 11th grade. (Admin. R. at 69, 251). She was in special education and attended a special school where she could work at her own pace. (*Id.* at 77). Even with these accommodations, she did poorly in school. (*Id.* at 76). These facts demonstrate the possibility that Isham's "deficits in adaptive functioning" manifested before age 22, which is a required element of Listing 12.05C. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C; *Maresh*, 438 F.3d at 899 (stating that one of the requirements to meet Listing 12.05C is "onset of the impairment before age 22[.]"); *Springer v. Colvin*, Civil No. 12-3115 (MJD/JSM), 2014 WL 702138, at *14 (D. Minn. Feb. 24, 2014) (finding the claimant's deficits in adaptive functioning were present before age 22 when claimant was "enroll[ed] in special

words, the "paragraph B" findings were not the only reason to affirm the ALJ; his decision was supported by substantial evidence in the record. *See Contreras*, 2009 WL 5252828, at *7–10.

[41]      Listing 12.05D requires

A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1.      Marked restriction of activities of daily living; or
2.      Marked difficulties in maintaining social functioning; or
3.      Marked difficulties in maintaining concentration, persistence, or pace; or
4.      Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05D. Listing 12.05D did not change between 2012 and 2013.

education from first grade through high school, and notes in her school records establish[] she was very slow in all response modalities").[42]

### 3.   IQ Score

Isham's full-scale IQ score is 72, and, as discussed above, the ALJ did not discredit this score. (Admin R. at 19, 384). This IQ score does not satisfy Listing 12.05C on its face because that Listing requires an IQ score of 60 through 70. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. But it does suggest the possibility that Isham's impairment is medically equivalent to Listing 12.05C under the POMS. POMS DI § 24515.056, at D1. While medical equivalence should be "very rarely" required, the POMS states that an IQ between 70 and 75, along with "the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination." *Id.*[43]

---

[42]     The Commissioner cites *Clay*, 417 F.3d at 929, for the proposition that "Listing 12.05C was not met where 'there [was] no evidence other than [the claimant's] poor performance in, and early exit from, school to suggest onset of an impairment before age 22.'" (Comm'r's Mem. in Supp. at 11) (quoting *Clay*, 417 F.3d at 929) (alteration in Comm'r's Mem. in Supp.). But unlike this case, the evidence in *Clay* did not include "a record of treatment, diagnosis, or even inquiry into a mental impairment prior to applying for benefits," which the court found weighed against finding an impairment. 417 F.3d at 929.
       The Commissioner cites *Sherrod v. Astrue*, No. 10-C-0451, 2011 WL 284349, at *6, 11 n.12 (E.D. Wis. Jan. 25, 2011), for the proposition that "substantial evidence supported [the] ALJ's determination that Plaintiff did not experience deficits in adaptive functioning—even though '[s]he did not have a driver's license and never did.'" (Comm'r's Mem. in Supp. at 11) (quoting *Sherrod*, 2011 WL 284349, at *6). Isham has never obtained a driver's license. (Admin. R. at 15) (citing *id.* at 280 (Isham's function report)). That neither the claimant in *Sherrod* nor Isham obtained a driver's license is not instructive in this case because in *Sherrod*, the ALJ expressly considered Listing 12.05C.

[43]     As Isham notes, her verbal IQ score was 68. (Isham's Mem. in Supp. at 33) (citing Admin. R. at 384–85). The verbal score appears to meet Listing 12.05C on its face, but Isham's argument is focused on medical equivalence. (*Id.*); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (requiring, *inter alia*, "[a] valid **verbal**, performance, **or** full scale IQ of 60 through 70 . . . ." (emphasis added)). The Court does not discuss the impact of the verbal score but on remand the ALJ should consider, whether, both in light of the evidence and in light of Isham's verbal score, Isham meets Listing 12.05C or her impairments are otherwise medically equivalent to Listing 12.05C.

### 4.      Significant Limitations

Listing 12.05C requires, *inter alia*, "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. An impairment that is severe under step two meets the "significant limitations" standard in Listing 12.05C. *Cook*, 797 F.3d at 690–91. The ALJ found Isham has the following severe impairments: "severe pulmonary impairment; history of ankle injuries; left-sided sensorineural hearing loss; affective and learning-related disorders; and history of drug and alcohol abuse . . . ." (Admin. R. at 12) (citing 20 C.F.R. § 416.920(c)). The ALJ stated that these impairments are severe "because they cause more than minimal limitation in the claimant's ability to perform basic work activities." (*Id.*). Arguably, the ALJ's determination that Isham has "affective and learning-related disorders" may overlap with the potential intellectual disability. *See* (*id.*). But even if the severe mental impairments are excluded, the ALJ's determination shows that Isham has "other physical . . . disorders that impose additional and significant work-related limitation of function," namely, "severe pulmonary impairment; history of ankle injuries; left-sided sensorineural hearing loss; . . . and history of drug and alcohol abuse . . . ." POMS DI § 24515.056, at D1; (Admin. R. at 12) (internal citation omitted); *see also Lott v. Colvin*, 772 F.3d 546, 550 (8th Cir. 2014) (finding the claimant satisfied the "additional severe impairments" requirement in 12.05C because the ALJ found additional severe impairments and cited 20 C.F.R. §§ 404.1520(c) and 416.920(c)); *Monroe*, 848 F. Supp. 2d at 984 (finding that when the ALJ expressly found that PTSD was a severe impairment and stated "that it caused more than minimal functional limitation, the ALJ was acknowledging that the PTSD significantly limited Monroe's ability to perform basic work activities" (internal quotation marks omitted)). As in *Monroe*, the ALJ in this

case specifically said the severe impairments "cause more than minimal limitation in [Isham's] ability to perform basic work activities." (Admin. R. at 12). Additionally, the ALJ appears to have specifically incorporated Isham's severe pulmonary impairment into the RFC because he prohibited Isham from "us[ing] cleaners that would be toxic, cause difficulty with breathing, or require someone to wear a mask . . . ." (*Id.* at 14).

### 5.    Remand

Isham asks the Court to reverse the ALJ's decision and award benefits. (Isham's Mem. in Supp. at 39). Isham's argument is focused on medical equivalence, and the standard under the POMS says only that certain criteria, if met, "**may** support an equivalence determination." POMS DI § 24515.056, at D1 (emphasis added). As discussed above, evidence in the record provides at least some evidence that Isham's impairments might meet or be medically equivalent to Listing 12.05C. But because there are arguably some inconsistencies in the record, remand is more appropriate to allow the ALJ to weigh the evidence. Because the ALJ failed to consider Listing 12.05C, the Court recommends that the case be remanded to the ALJ for further action consistent with this Report and Recommendation.[44]

---

[44]    The Commissioner cites *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999) for the proposition that the Eighth Circuit

> reject[ed] the plaintiff's argument . . . "that the ALJ insufficiently explained the finding that he did not suffer from a listed impairment"—even though "[t]he ALJ did not discuss . . . any . . . listing specifically"—because the Eighth Circuit has "consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."

(Comm'r's Mem. in Supp. at 11–12) (quoting *Senne*, 198 F.3d at 1067). The Eighth Circuit went on to say that "the conclusory form of the ALJ's decision **alone**" does not justify remand. *Senne*, 198 F.3d at 1067 (emphasis added). But *Senne* is not inapposite because the Eighth Circuit in *Senne* found it was "unable to ascertain on this particular record whether the ALJ's denial of [the claimant's] claim under Listing 1.13 was supported by substantial evidence." *Id.* Similarly, in

### D.      Isham's Arguments at Steps Four and Five

Isham raises several additional arguments, all of which relate to the ALJ's RFC determination. (Isham's Mem. in Supp. at 34–38). Specifically, Isham contends the ALJ erred in finding that: (1) Isham's work as a cleaner was past relevant work; (2) Isham has marginal education and is not illiterate; and (3) the VE's testimony was consistent with the DOT. (*Id.*). Because the Court concludes that remand is necessary due to the ALJ's failure to consider Listing 12.05C at step three of the analysis, and these issues all relate to later steps in the ALJ's analysis, the Court need not and does not make a recommendation regarding these additional claims of error. *See* 20 C.F.R. § 416.920(a); *see, e.g., Travis v. Astrue*, No. 11-cv-1808 (TNL), 2012 WL 4339107, at *26 (D. Minn. Sept. 18, 2012) (concluding that because the court was remanding the case for an error at step three, analysis of alleged errors at step five was unnecessary); *Cunningham v. Astrue*, No. CV 11-144 JC, 2011 WL 5103760, at *6, 6 n.4 (C.D. Cal. Oct. 27, 2011) (remanding for "further consideration and clarification on the ALJ's step three finding" and declining to "adjudicate[] plaintiff's other challenges to the ALJ's decision, except insofar as to determine that a reversal and remand for immediate payment of benefits would not be appropriate.").

The Court does find it appropriate, however, to discuss what appears to be a procedural problem with the ALJ's decision, as this discussion may be informative should the ALJ reach the latter steps of the analysis on remand. As noted, Isham asserts that the ALJ erred in finding that the VE's testimony was consistent with the DOT. (Isham's Mem. in Supp. at 37–38). In making this argument, Isham contends that the ALJ "failed to resolve [a] conflict" between the VE's

---

this case, the Court is unable to determine whether the ALJ's decision that Isham's impairment or combination of impairments does not meet or medically equal Listing 12.05C is supported by substantial evidence. In other words, the ALJ's decision is not merely "a deficiency in opinion-writing." *See id.*

testimony and the DOT regarding the reading level required for the job of cleaner that was discussed by the VE and relied on by the ALJ in concluding that Isham is not disabled. (*Id.*).

The VE, Harris, testified that under the DOT, work as a cleaner requires a reading ability of 2, which means "[r]ecognizing the meaning of 2,500 two or three-syllable words, reading at a rate of 95 to 120 . . . words per minute, print[ing] simple sentences, [and] mak[ing] simple sentences." (Admin. R. at 45). Isham's counsel asked Harris if someone who was "functionally illiterate" would be able to perform the job of cleaner. (*Id.* at 46). Harris testified that such an individual could perform the work based on her experience placing non-English-speaking people in cleaning jobs. (*Id.*). In follow-up questions, Harris explained that the "DOT gives maximum ability" rather than "minimum ability." (*Id.*). Harris stated that the "DOT is just a resource" and that she had "seen many . . . non-English[-speaking] people" performing cleaning jobs. (*Id.*). Harris acknowledged that her testimony differs from the DOT in this respect. (*Id.*).

"When a VE . . . provides evidence about the requirements of a job or occupation" the ALJ "has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and the information provided in the DOT." *Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000); *see also Renfrow v. Astrue*, 496 F.3d 918, 920–21 (8th Cir. 2007) (discussing requirements established in SSR 00-4p). The ALJ must not only "ask the expert whether there was a conflict," but must also "obtain an explanation for any such conflict." *Renfrow*, 496 F.3d at 921. In addition, "[w]hen vocational evidence provided by a VE . . . is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled." SSR 00-4p, 2000 WL 1898704, at *4. The ALJ "must explain the

resolution of the conflict irrespective of how the conflict was identified." *Id.*

> Neither the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict. The [ALJ] must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information.

*Id.* at *2.

Here, the ALJ noted that the DOT requires a reading level of 2 for the job of cleaner. (Admin. R. at 22). The ALJ also noted that Harris testified that "a person with functional illiteracy could perform [cleaning] jobs based on her experience placing people in those jobs who could not speak English." (*Id.*). The ALJ then stated, "Pursuant to SSR 00-4p, the undersigned has determined that the [VE]'s testimony is **consistent with** the information contained in the [DOT]." (*Id.*) (emphasis added).

As Isham points out, Harris specifically testified that, with regard to the reading level required for cleaning jobs, her testimony differed from the DOT. (*Id.* at 46); (Isham's Mem. in Supp. at 37). The Commissioner does not dispute this testimony, agreeing with Isham that Harris's "testimony . . . differed from the [DOT]" with regard to reading level requirements. (Comm'r's Mem. in Supp. at 16). In discussing Harris's explanation as to why she believed someone who was functionally illiterate could perform work as a cleaner, it seems that the ALJ was attempting to express his determination that Harris's explanation was a reasonable one that provided a basis for relying on her testimony, rather than the requirements in the DOT. *See* SSR 00-4p, 2000 WL 1898704, at *4. The issue is confused, however, by the ALJ's ultimate conclusion that Harris's testimony was "consistent with" the DOT. (Admin. R. at 22). Thus, while the parties agree that Harris's testimony presented a conflict for the ALJ's resolution, it is not clear whether the ALJ recognized the conflict and failed to clearly explain the resolution of the conflict as required by SSR 00-4p, or failed to recognize the conflict and therefore did not

consider how to resolve any apparent conflict.[45] On remand, the ALJ should comply with the requirements of SSR 00-4p and clarify his treatment of Harris's testimony regarding the reading level required for the job of cleaner.

## IV.   CONCLUSION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Isham's Motion for Summary Judgment [Doc. No. 20] be **GRANTED in part** and **DENIED in part**. The Motion is **GRANTED** as to remand; and **DENIED** to the extent Isham seeks reversal for an award of benefits;

2.    The case be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation, in accordance with sentence four of 42 U.S.C. § 405(g); and

3.    The Commissioner's Motion for Summary Judgment [Doc. No. 28] be **DENIED**.

Dated: January 30, 2015

*s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

---

[45]    As noted, the Court refers to the issue as a procedural problem with the ALJ's decision because Isham does not contend that there would have been error had the ALJ taken proper steps to resolve the conflict between the VE testimony and the DOT, nor does she argue that Harris's testimony was not reasonable and could not provide a basis for relying on the VE rather than the DOT. *See* (Isham's Mem. in Supp. at 37–38). Rather, Isham contends that because "the ALJ **failed to resolve the conflict**[,] the VE testimony that work as a cleaner is available cannot be relied upon to sustain the ALJ's decision." (*Id.*) (emphasis added).

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of court, and serving all parties by **February 13, 2015**, a writing which specifically identifies those portions of this Report and Recommendation to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.